Edward A. BILISKI, Appellant

v.

RED CLAY CONSOLIDATED SCHOOL DISTRICT BOARD OF EDUCATION; Irwin J. Becnel, Jr.; Charles Cavanaugh; Gary Linarducci; James J. Buckley; Marguerite Vavala; Yvonne Johnson; Martin A. Wilson, Sr., individually and in their official capacities as members of the Red Clay Consolidated School District Board of Education; Robert J. Andrzejewski, individually and in his official capacity as Superintendent of the Red Clay Consolidated School District; Red Clay Consolidated School District.

No. 08–1742.

United States Court of Appeals,
Third Circuit.

Argued March 5, 2009.

Filed: July 29, 2009.

Joseph M. Bernstein (Argued), Wilmington, DE, Attorney for Appellant.

Seth J. Reidenberg, Barry M. Willoughby (Argued), Young, Conaway, Stargatt & Taylor, Wilmington, DE, Attorneys for Appellee.

Before: SLOVITER, HARDIMAN, Circuit Judges, and POLLAK,* District Judge.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

Edward A. Biliski ("Biliski") brought this civil rights action under 42 U.S.C. § 1983 against his former employer, the Red Clay Consolidated School District Board of Education (the "Board"), and individual defendants employed by the Board (together, "Red Clay"), alleging that they violated his procedural due process rights in terminating his employment. The District Court entered summary judgment in favor of Red Clay, concluding that Biliski was an at-will employee without a constitutionally protectable property interest in his job and, therefore, he could not establish a due process claim. We find it unnecessary to address whether Biliski possessed a property interest in his continued employment because, even assuming that he had such an interest, the process he received comported with his rights under the Due Process Clause of the Fourteenth Amendment.

## I.

### Factual and Procedural Background

Biliski was employed by the Red Clay School District as a computer technician

---

* Hon. Louis H. Pollak, Senior Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

from March 20, 2001, until he was terminated effective August 11, 2006. During that time, he was also briefly employed as a Help Desk Coordinator, but returned to his job as a technician. Biliski was under the impression that he could only be fired for "just cause," but admits that this understanding came from his co-workers, not from any documents he received from Red Clay. App. at 29.

Biliski's termination resulted from several performance issues that began in March 2006. On March 30, 2006, Ted Ammann, Red Clay School District's Manager of Technology, addressed a disciplinary memo to Biliski, noting that he failed to meet an important deadline (after being asked to do so a "number of times"), that he refused to undertake another task he was asked to complete, saying that it was "someone else's job," and that he showed a "lack of respect and attention" at a customer service training. App. at 80. This memo also states that "[f]ailure to demonstrate an improved attitude as well as completion of assigned tasks will result in disciplinary action," and that "[t]here will be a follow-up by the end of April regarding the issues outlined above." App. at 80. The memo has a place for Biliski's signature at the bottom but is not signed by Biliski. In his deposition, Biliski recalled a meeting with Ted Ammann and Cara Gaudino, Red Clay's technology coordinator and Biliski's direct supervisor, in which they told him they were "disappointed" in him or his work, but Biliski claimed that he was not given a copy of this disciplinary memo. App. at 45. Biliski also testified that he did not recall being told he had to improve his performance within a specific period of time or that failure to do so would result in discipline.

On July 31, 2006, Ammann issued Biliski a second memo regarding another missed deadline. The memo states: "Future missed deadlines will result in disciplinary action up to and including termination." App. at 81. Biliski testified that he discussed this missed deadline with Ammann and was given a copy of this memo by Ammann's secretary, Rhonda Henry–Carter, but Biliski refused to sign it: "I told [Henry–Carter] something like I got 4,000 closed work orders and he's going to make a big deal out of this one little thing." App. at 47. Henry–Carter's version of that conversation was that Biliski "became very angry and said that he wasn't going to sign that 'fucking memo.'" App. at 131. Biliski denied using profanity, but admitted making disparaging comments about Ammann.

On August 8, 2006, Biliski was called to a meeting with Ammann and Debra Davenport, Red Clay School District's manager of human resources, and was given three disciplinary memos, each dated August 7, 2006. The first relates to the inappropriate language and behavior he displayed when refusing to sign the earlier memo and also cites him for leaving the office that day without informing anyone of his whereabouts. It states that Biliski had been told to email his supervisor when leaving and that "[c]ursing or disparaging remarks about supervisors ... will lead to discipline up to and including termination." App. at 83. The second memo cites him for parking in a fire lane after having received an email (sent to the whole team) directing employees not to park there. The third memo states that when asked to unload a van of equipment several days before, Biliski refused and stated, "No, I'm not doing it. I've been in the schools and it's hot." App. at 85. The memo also informed him that his "[f]ailure to complete assigned tasks can not [sic] be tolerated and continued refusal will lead to disciplinary action up to and including termination." App. at 85.

In his deposition, Biliski testified that he was not given an opportunity to respond to the charges in the memos: "During that meeting when I tried to rebut what he was saying, Debra Davenport stopped me [and] said, 'Oh, no, you don't.... You have to listen to what he's saying.'" App. at 55. However, in a "verification" filed in the District Court, Ammann claimed that "Biliski was given an opportunity to explain his actions," but instead just "talked about issues that were unrelated to the performance problems raised." App. at 129.

At the end of the August 8, 2006, meeting, Biliski was given a letter informing him that his name "will be submitted to the Board of Education for termination" and that "[i]f approved your date of termination will be effective August 11, 2006." App. at 86. Biliski admits that the meeting ended with him calling Ammann a "no good motherfucker," throwing a pencil at him, and being asked to leave the building. App. at 56.

Sometime after this meeting, the deputy superintendent, Diane Dunmon, received a "form" from Davenport recommending Biliski's dismissal. Dunmon's deposition testimony was that she would normally have a follow-up conversation with a supervisor about the employee's potential dismissal, so she would have had conversations about Biliski (and seen corroborating documents). However, Dunmon had no "detailed recollections other than there were performance issues as I recall." App. at 67–68. As a general matter, when the administration recommended firing an employee, it presented the Board with an oral report at a Board meeting on the reasons for termination, but did not also submit underlying documentation.

The August 8, 2006, letter informed Biliski that the Board would decide the issue of his termination, but did not include the date of the Board meeting. After he received this letter, Biliski telephoned individual Board members to ask them not to vote on his dismissal until they heard his side of the story. Irwin J. Becnel, Jr., President of the Board, testified at his deposition that when Biliski told him that he had a letter that he wanted to submit to the Board, Becnel advised Biliski to take his letter to the Board secretary who would distribute it to the Board. Biliski's letter was photocopied and circulated to the Board members for the August 16, 2006, meeting at which Biliski's dismissal was discussed.

Biliski's letter incorporated copies of four of the disciplinary memos he received and contained his lengthy responses to each of the disciplinary charges contained therein. Biliski argued that other employees did worse things than he had done and got away with them, that he did more work than anyone else, that he was joking when he refused to unload the van equipment and did not help unload the equipment because another employee said he should not do it because of his "heart condition,"[1] that he was too busy with other work to meet his deadlines, that he was so busy he completely overlooked an entire project, and that he had not read the email instructing employees not to park in the fire lane. This rebuttal letter (including the attached memos) is fifteen pages long.

Becnel, the Board President who advised Biliski to submit a rebuttal letter to the Board, testified at his deposition that Biliski's letter was discussed by the Board members at the meeting. He stated: "As

---

1. There is no record reference to any heart condition, and no indication that Biliski ever filed a worker's compensation claim.

I remember Mr. Biliski's letter, I don't recall him refuting any of [the] reasons [the administration gave in support of his termination]." App. at 75. The Board approved Biliski's termination and sent him a letter dated August 17, 2006, notifying him that he had been terminated effective August 11, 2006. Biliski testified that he never received this letter and that the Board also never responded to his rebuttal letter. On August 21, 2006, Dunmon received a letter from Biliski, requesting a meeting about his termination, but did not respond.

On December 5, 2006, Biliski filed a complaint against Red Clay in the United States District Court for the District of Delaware, claiming that he had a property interest in his continued employment and that his dismissal constituted a deprivation of "his right to procedural due process under the Fourteenth Amendment ... actionable under 42 U.S.C. § 1983." App. at 22. Biliski sought 1) a declaratory judgment that the defendants' acts were unlawful and unconstitutional, 2) preliminary and permanent injunctions restoring him to his job and enjoining defendant from firing him again "unless the termination procedures ... comply with ... due process," and 3) "monetary damages, including but not limited to backpay, future earnings and fringe benefits, and compensation for all other injuries and losses proximately caused by the unlawful acts of defendants." App. at 23.

After discovery and depositions, Red Clay and Biliski each filed a motion for summary judgment. As he does here, Biliski argued that he had a property interest in his job because his at-will employment status had been altered by a Red Clay policy adopted in 1985 ("1985 Poli-

cy"), which provided that classified employees may be fired only for "just and reasonable cause" and after "notify[ing] the employee in writing of the charges and ... provid[ing] an opportunity for a hearing." App. at 114.

The District Court granted summary judgment in favor of Red Clay, finding that Biliski had no protectable property interest in his job because no statute limited his employer's ability to fire him and citing Delaware precedent for the proposition that "unilateral expressions of company policies that do not set out a definite term of employment, such as in an employee handbook, do not alter an employee's at-will status." App. at 8. Biliski timely appealed.

## II.

### Standard of Review

"Our review of the District Court's grant or denial of summary judgment is plenary, and we apply the same standard that the District Court applied in determining whether summary judgment was appropriate." *Norfolk S. Ry. v. Basell USA Inc.*, 512 F.3d 86, 91 (3d Cir.2008). Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). "In making this determination, we 'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Norfolk*, 512 F.3d at 91 (quoting *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 276 (3d Cir.2001)).[2]

**2.** The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), and we have jurisdiction under 28 U.S.C. § 1291.

## III.

## Discussion

 "To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir.2005). We have explained that a plaintiff, as in the case of Biliski, who seeks to establish a procedural due process claim must demonstrate that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir.2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir.2000)).

 In this case, the District Court concluded that Biliski did not have a property interest in his job and, therefore, declined to reach the question of whether the process Biliski received was constitutionally sufficient. On appeal, Biliski argues that he possessed a constitutionally protectable property interest in his continued employment because "the Board's adoption of the '1985 Policy' was clearly a legally sufficient expression of the Board's intention to limit its discretion to fire District employees." Appellant's Br. at 18. We have held that "[t]o have a property interest in a job . . .

a person must have more than a unilateral expectation of continued employment; rather, she must have a legitimate entitlement to such continued employment." *Elmore*, 399 F.3d at 282 (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92. S.Ct. 2701, 33 L.Ed.2d 548 (1972)). As a result, an at-will employee has " 'no property interest' in [his or her] job sufficient to trigger due process concerns." *Id.* (quoting *Bishop v. Wood*, 426 U.S. 341, 346 n. 8, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976)).

The Policy on which Biliski relies was adopted in 1985 and states, inter alia, that no employee will be dismissed "except for just and reasonable cause."[3] Red Clay contends that the 1985 Policy was insufficient to confer a property right because it was a unilateral employer policy that did not have the force of law necessary to alter Biliski's at-will status.

 Despite the parties' arguments in this case, we need not decide whether the 1985 Policy conferred a property interest because, even assuming *arguendo* that Biliski had such an interest, the process that Biliski received comported with the requirements of due process. "We may affirm a District Court's judgment on grounds other than those considered by the District Court itself," *Hughes v. Long*, 242 F.3d 121, 122 n. 1 (3d Cir.2001), as long as those grounds were presented to the court below, *Halderman v. Pennhurst State Sch. & Hosp.*, 673 F.2d 628, 639 (3d

---

**3.** The Policy reads:

SUSPENSION AND DISMISSAL OF CLASSIFIED STAFF MEMBERS

It will be the policy of the Board to strive to assist personnel in every possible way to adjust to their positions and to perform their duties satisfactorily. Every reasonable effort will be made to avoid dismissing personnel at any level.

No employee will be dismissed except for just and reasonable cause, and only after an investigation has been conducted and written and signed charges have been filed within the Board. The Board, if it decides to proceed on the charges, will notify the employee in writing of the charges and will provide an opportunity for a hearing.

The Board, upon recommendation by the superintendent or designee, has the right to suspend an employee against whom formal charges have been filed, until such time as a decision has been rendered.

App. at 114.

Cir.1982) (en banc) ("Ordinarily we do not consider ... matters which were not first presented to the District Court.").[4]

■ "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). However, "[i]t is by now well established that '"due process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.'" *Gilbert v. Homar*, 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) (quoting *Cafeteria & Rest. Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). "'[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'" *Id.* (alteration in original) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). For instance, the Supreme Court has "'rejected the proposition that [due process] *always* requires the State to provide a hearing prior to the initial deprivation of property.'" *Id.* (emphasis and alteration in original) (quoting *Parratt v. Taylor*, 451 U.S. 527, 540, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)).[5] "Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires

analysis of the governmental and private interests that are affected." *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (citing *Arnett v. Kennedy*, 416 U.S. 134, 167–68, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring in part)).

In *Mathews v. Eldridge*, the Supreme Court held that the "identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335, 96 S.Ct. 893.

■ In *Loudermill*, the Supreme Court held that a "pretermination 'hearing' ... need not be elaborate," but "[t]he opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement." 470 U.S. at 545–46, 105 S.Ct. 1487. "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546,

---

4. In its motion for summary judgment, Red Clay argued that "[e]ven if this Court were to conclude that Biliski had a constitutionally protected property interest, Biliski was provided with procedural due process that met constitutional standards." Defendants' Opening Br. in Support of Their Motion for Summary Judgment at 17, *Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, No. 06–740, 2007 WL 4425851 (D.Del. Oct. 29, 2007). Both parties also briefed this issue on appeal.

5. The Supreme Court "has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, post-deprivation process satisfies the requirements of the Due Process Clause."

*Gilbert*, 520 U.S. at 930, 117 S.Ct. 1807.

105 S.Ct. 1487. Moreover, "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Id.* at 545, 105 S.Ct. 1487 (alteration in original). "In general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action." *Id.* (quoting *Mathews,* 424 U.S. at 343, 96 S.Ct. 893). *Loudermill* addresses the contours of pre-deprivation procedural requirements in a factual scenario where the plaintiff, a "tenured public employee," had been provided a post-termination hearing. 470 U.S. at 546, 105 S.Ct. 1487.

Biliski does not argue that he was entitled to the full panoply of formal proceedings that Delaware state law provides for termination of the employment of teachers. *See* Del. Ann.Code tit. 14, § 1413. Biliski argues that he was covered by the 1985 Policy which applies only to "classified employees." The District Court never decided whether Biliski was a "classified employee," an issue we also do not decide. Instead, we consider whether, assuming *arguendo* he was entitled to due process, the process he received comported with that requirement.

■ We apply the interest-balancing framework that the Supreme Court established in *Mathews v. Eldridge* to decide whether the totality of the administrative process Biliski received in connection with his termination, including the written presentation of his position to the formal decision-maker, satisfied the "fundamental requirement of due process[, which] is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews,* 424 U.S. at 333, 96 S.Ct. 893 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). Here, the factors we consider are

(1) Biliski's private interest in retaining his employment, (2) Red Clay's "interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens" and (3) "the risk of erroneous termination." *Loudermill,* 470 U.S. at 543, 105 S.Ct. 1487.

First, Biliski's private interest in his job is, of course, significant. The Supreme Court has often "recognized the severity of depriving someone of the means of his livelihood." *Gilbert,* 520 U.S. at 932, 117 S.Ct. 1807; *see also Loudermill,* 470 U.S. at 542–43, 105 S.Ct. 1487; *Fed. Deposit Ins. Corp. v. Mallen,* 486 U.S. 230, 243, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988). "While a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job." *Loudermill,* 470 U.S. at 543, 105 S.Ct. 1487.

Second, Red Clay has a significant countervailing interest in removing employees who fail to perform satisfactorily, display inappropriate workplace behavior, and have been warned that continued performance problems would lead to their termination. Moreover, Red Clay has an interest in removing such employees by means that do not cause disproportionate fiscal or administrative burdens.

Third, "[t]he last factor in the *Mathews* balancing, and the factor most important to the resolution of [Biliski's] case, is the risk of erroneous deprivation [posed by the procedures afforded] and the likely value of any additional procedures." *Gilbert,* 520 U.S. at 933, 117 S.Ct. 1807.

Biliski received constitutionally sufficient notice of the reasons that Red Clay sought his dismissal. Biliski was issued five disciplinary memos between March 30,

2006, and August 8, 2006.[6] Each memo outlined specific instances of poor work performance or inappropriate behavior and warned Biliski that failure to improve his performance could result in disciplinary action. The second disciplinary memo, dated July 31, 2006, which concerned a missed deadline, specifically warned that "[f]uture missed deadlines will result in disciplinary action up to and including termination." App. at 81. The last three memos, all of which Biliski received during his August 8, 2006, meeting, also cited specific instances of inappropriate or unsatisfactory conduct (i.e., cursing at Ammann's secretary when she gave Biliski the July 31, 2006, memo, leaving the office for two hours without informing anyone, refusing to unload an equipment van, and parking in a fire lane after having been sent an email reminding employees not to do so). Moreover, Biliski's supervisors gave him these memos at face-to-face meetings in which they orally explained to Biliski the contents of the memos.

Biliski complains that he received no notice of the August 8, 2006, meeting and that he was not given an opportunity to respond to the charges in the memos he received at that time.[7] The ultimate decision-maker here was the Board, not the Red Clay administrators who recommended Biliski's termination. The relevance of the meetings and the disciplinary memos was that they provided Biliski notice of the charges against him and the

fact that the Board would decide the issue of his termination.

Moreover, even after August 11, 2006, set by the August 8, 2006, letter as the effective date of Biliski's termination, Biliski received what was in effect a post-deprivation hearing, albeit not an oral hearing. When Biliski contacted members of the Board, he was informed about the Board meeting and was told by the Board President that he could submit a letter refuting the charges against him. Because Biliski knew both the nature of the charges against him and that the Board, the relevant decision-maker, would be voting on his termination, he received enough notice so that he could, and did, prepare a detailed and lengthy written response to the charges against him in advance of the August 16, 2006, Board meeting.

Likewise, Biliski's submission of his fifteen-page rebuttal letter to the Board, combined with the Board's actual consideration of that letter at its meeting, afforded Biliski a meaningful opportunity to be heard on the issue of his termination. Biliski's letter included copies of the four disciplinary memos he acknowledged receipt of and specifically responded to each of the charges in detail.[8] This letter allowed Biliski to give context to the disciplinary charges against him and to offer his version of the events cited in the memos. In addition, the record shows-and Biliski does not dispute-that the Board consid-

---

6. Biliski denies receiving the first memo or being told at that time that failure to improve his performance could lead to disciplinary action. Nevertheless, in his deposition, Biliski testified that he recalled the events described in that memo and the meeting with Ted Ammann and Cara Gaudino in which they told him they were "disappointed" in him or his work. App. at 45.

7. Biliski conceded that he discussed the missed deadline cited in the July 31, 2006,

memo at a meeting with Ammann and Gaudino before he received this memo.

8. Although Biliski did not address the contents of the first memo, dated March 30, 2006, in his rebuttal letter because of his claim that he did not receive it, there is no evidence in the record that the Board took this memo (or the charges therein) into consideration when making the decision to terminate him.

ered his rebuttal letter at its meeting and still voted to fire him.

■ Biliski is not explicit about what "additional or substitute procedural safeguards," *Mathews*, 424 U.S. at 335, 96 S.Ct. 893, would have rendered the process he received constitutional. He cannot argue that the Board did not have an opportunity to "hear" his responses to the allegations charges against him, as it is clear that the Board members did in fact receive copies of his rebuttal letter. Indeed, it was the Board President who arranged for copies of Biliski's response to be copied and distributed to each member before the Board voted. Biliski complains that "the letter did not inform [him] that he could appear before the Board to contest his termination" and that "while the District administration was given the opportunity to explain in person why it wanted to fire Biliski, the same opportunity to appear before the Board to refute the District's allegations was not afforded to [him]." Biliski Br. at 23. Insofar as Biliski contends that he had a constitutional right to present oral responses at a formal hearing, he is mistaken. "There is no inexorable requirement that oral testimony must be heard in every administrative proceeding in which it is tendered." *Mallen*, 486 U.S. at 247–48, 108 S.Ct. 1780 (citing *Califano v. Yamasaki*, 442 U.S. 682, 696, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)); *see also* Henry J. Friendly, *Some Kind of Hearing*, 123 U. Pa. L.Rev. 1267, 1281 (1975) ("Determination whether or not an oral hearing is required should depend on the susceptibility of the particular subject matter to written presentation, on the ability of the complainant to understand the case against him and to present his arguments effectively in written form, and on the administrative costs."). Although there may be circumstances that require the employee be given the opportunity to give oral testimony (or other trial-type procedures) in order for the hearing to comport with due process, this is not such a case.

Under these circumstances, we fail to see how more elaborate pre-termination proceedings (or an oral post-termination hearing) would have led to a different result.[9] In that sense, any additional or substitute safeguards provided to Biliski would have had no probable value.

Moreover, the record shows that the Board had ample cause to dismiss Biliski. His own testimony shows that he had trouble meeting deadlines and managing his workload, and that he exhibited inappropriate language and behavior at work. This suggests that additional safeguards would indeed have been of no actual value to Biliski.

Considering the *Mathews v. Eldridge* factors as relevant here, we are satisfied

---

9. In connection with arguing that his pre-termination proceedings were constitutionally deficient, Biliski also argues that "the defendants['] failure to provide any post-deprivation hearing clearly violated *Gilbert [v. Homar]*." Appellant's Br. at 25. This argument is without merit. In *Gilbert*, a state employee, who had been suspended without pay and later demoted after a post-suspension hearing, argued that the state's failure to provide him with a pre-suspension hearing violated due process. 520 U.S. at 926–928, 117 S.Ct. 1807. The Supreme Court rejected his claim, holding that "the State had no constitutional obligation to provide [plaintiff] with a presus- pension hearing." *Id.* at 933, 117 S.Ct. 1807. *Gilbert* did not address the necessity of post-deprivation proceedings. Similarly, neither *Loudermill*, nor any other case of which we are aware, holds that a post-deprivation hearing is always constitutionally required. Instead, the *Loudermill* Court observed " 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.' " *Loudermill*, 470 U.S. at 542, 105 S.Ct. 1487 (emphasis in original) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)).

that Biliski received fair notice and an opportunity to be heard as to why the Board should not terminate his employment. In other words, given the interests at stake here, Biliski received all the process that was due him.

Although Biliski has identified no binding authority to support his position, he urges us to follow the reasoning of the United States District Court for the District of Delaware in its unreported decision in *Hameli v. Nazario*, No. 94–199, 1994 WL 827787, at *4 (D.Del. Sept.2, 1994). In that case, Hameli, the Delaware Chief Medical Examiner, was terminated after a former employee accused him of sexual harassment. *Id.* at *1, 3. The state offered an opportunity for Hameli to be heard at an informal pre-termination hearing at which he could be represented by counsel and respond to the charges against him, but also informed him that no post-termination process would be offered. *Id.* at *3. When Hameli responded that the process offered was deficient, he was terminated. *Id.* The district court agreed with Hameli, finding the "hearing did not provide plaintiff with a meaningful opportunity to be heard in a meaningful manner" because the proposed pre-termination proceedings did not require "defendants . . . to put on a case," and did not allow Hameli the opportunity to cross examine witnesses or challenge the authenticity of the evidence against him. *Id.* at *6–7. The court added: "This conclusion is all the more compelling given the lack of a post-termination hearing." *Id.* at *7. Moreover, the court stressed that "due process required confrontation and cross-examination of the State's witnesses" because "plaintiff's termination was based upon serious accusa-

tions having possible criminal implications." *Id.* at *7.

Even if *Hameli* were binding on this Court—which, of course, it is not—it is readily distinguishable from Biliski's case. The charges against Biliski accused him of failing to complete projects on time, failing to comply with rules, and displaying inappropriate workplace behavior. Nothing in the charges against him had "possible criminal implications." As such, Biliski's private interest in his job—to be weighed as part of the *Mathews v. Eldridge* balancing test—is not comparable to the interest at stake in *Hameli,* where the plaintiff faced possible criminal or civil liability for his alleged conduct.

## IV.

Due process entails a balancing, appropriate to the circumstances of the particular case. In most instances, a formal pre-termination hearing is adequate. When that is not practical, a post-termination proceeding will suffice. In some instances, as here, where Biliski presented to the final-decision maker the reasons not to proceed with his termination, some combination of the two is adequate.

For the above-stated reasons, we conclude that Biliski received the proceedings to which he was entitled under the Due Process Clause of the Fourteenth Amendment. Accordingly, we will affirm the judgment of the District Court.[10]

---

**10.** Biliski's motion for leave to supplement the record, dated August 18, 2008, is dis- missed as moot.