**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 09-2051 and 10-1633

———————

MICHAEL C. SCHMIDT,

Appellant.

v.

JAMES P. CREEDON, CONNIE A. TENNIS,
RICHARD A. SHAFFER, GREGORY A. GREEN

———————

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D. C. Nos. 4-07-cv-01190 and 1-09-cv-00323)
District Judge:  Honorable John E. Jones

———————

No. 09-2051 Argued on November 2, 2010

No. 10-1633  Submitted under Third Circuit LAR 34.1 (a)
on November 2, 2010

Before:  SCIRICA, STAPLETON and ROTH, Circuit Judges

(Opinion filed: March 29, 2011)

Nathan C. Pringle, Jr., Esquire **(Argued)**
2300 Vartan Way
Second Floor
Harrisburg, PA  17110

Counsel for Appellant


Thomas W. Corbett, Jr., Esquire
Attorney General
Howard G. Hopkirk, Esquire  **(Argued)**
Senior Deputy Attorney General
Calvin R. Coons, Esquire
Senior Deputy Attorney General
John G. Knorr, III, Esquire
Chief Deputy Attorney General
Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA  17120

Counsel for Appellees

_____

OPINION
_____

**ROTH,** Circuit Judge:

This appeal involves the application of the Fourteenth Amendment's Due Process Clause to the suspension of

policemen in Pennsylvania.  Michael Schmidt, an officer in Pennsylvania's Capitol Police, claims that appellees, senior officers of the Capitol Police and officials of Pennsylvania's Department of General Services, violated his due process rights when they failed to provide him a hearing before suspending him without pay.  In deciding this appeal, we keep in mind that, classified employees under Pennsylvania's Civil Service Act cannot be suspended or terminated without just cause.[1]  This recognition of this property interest in their positions has been applied both to terminations and to suspensions.  *See, e.g., Dee v. Borough of Dunmore*, 549 F.3d

---

[1] 71 Pa. Stat. § 741.803 provides in pertinent part that "[a]n appointing authority may for good cause suspend without pay for disciplinary purposes an employe[e] holding a position in the classified service. . . .  What shall constitute good cause for suspension may be stated in the rules."  *See also* 4 Pa. Code § 101.21(a) (defining "good cause" for suspension).  Similarly, 71 Pa. Stat. § 741.807 provides that "[n]o regular employe[e] in the classified service shall be removed except for just cause."  The "good cause" and "just cause" standards are similar and Pennsylvania courts have applied the "good cause" standard in termination cases.  *See Office of Att'y Gen. v. Colbert*, 598 A.2d 344, 346 (Pa. Commw. Ct. 1991); *appeal dismissed* 619 A.2d 1062 (Pa. 1993) (citing 4 Pa. Code § 101.21(a)); *Stone v. State Correctional Inst. at Graterford*, 422 A.2d 1227, 1227-28 (Pa. Commw. 1980) (same); *but cf. Woods v. State Civil Serv. Comm'n*, 590 Pa. 337, 344 (Pa. 2006) (employee's arrest was "good cause" for suspension, but not "just cause" for termination because employee was not convicted and there was no evidence that arrest interfered with his duties).

225, 230 (3d Cir. 2008).[2]  Absent extraordinary circumstances, the statute has been interpreted as creating a property interest requiring at least a brief and informal pre-termination or pre-suspension hearing.[3] *Id.*

In the case before us, the District Court held that, despite Schmidt's property interest in his position, because there was a post-suspension hearing provided by the Collective Bargaining Agreement (CBA), no pre-suspension hearing was necessary.  We now hold that, except for extraordinary situations, under Pennsylvania law, even when union grievance procedures permit a policeman to challenge his suspension after the fact, a brief and informal pre-termination or pre-suspension hearing is necessary.  However, because this rule was not clearly established at the time of Schmidt's suspension, we conclude that appellees are entitled to qualified immunity.

---

[2]*Dee* considered the suspension of a fireman under 53 Pa. Stat. § 46190, which imposes essentially the same limitations on suspension as the Civil Service Act.  *Compare* 53 Pa. Stat. § 46190(1)-(6) *with* 71 Pa. Stat. § 741.803; 4 Pa. Code § 101.21(a)(1)-(6).

[3]*See, e.g., Bd. Of Regents v. Roth*, 408 U.S. 564, 577 (1972); *Kelly v. Borough of Sayreville*, 107 F.3d 1073, 1077 (3d Cir. 1997) (holding state law creates property rights protected by Fourteenth Amendment).

4

## I. Background

### A. Schmidt's Handling of Complaint Against Senior Capitol Police Officers

Schmidt was hired in November 2002 by the Department of General Services (DGS) of the Commonwealth of Pennsylvania to serve as a patrol officer with Capitol Police. On July 15, 2006, Schmidt had a scheduled shift at the Harristown post, an area of Harrisburg covering the Attorney General's Office and the Rachel Carson Building. Before his shift began, Schmidt was approached by a fellow officer, Kenneth Shaffer (Officer Shaffer), who wanted to file a complaint against his superior officers, Richard Shaffer, the Superintendent of the Capitol Police (Superintendent Shaffer),[4] Robert Dillard, Deputy Superintendent, and Robert J. Rapak, a Special Investigator.

The parties dispute the nature of Officer Shaffer's complaint: according to appellees, Officer Shaffer merely wished to file a union grievance, but according to Schmidt, Officer Shaffer also wanted to file a criminal complaint.

Officer Shaffer wanted to file the complaint because he believed he was about to be charged with misconduct by his supervisors in retaliation for his refusal to re-file charges against a suspect in an incident that he believed had already been resolved.[5] Officer Shaffer wanted a union

---

[4]Officer Kenneth Shaffer is not related to Superintendent Richard Shaffer.

[5]According to a report prepared by the Office of Inspector General (OIG) of the DGS, the incident had not

representative available when he was served with paperwork relating to his own alleged misconduct.

Schmidt told Officer Shaffer that John Bruno, a fellow police officer and union representative, would be available soon. After Bruno arrived, Officer Shaffer explained his complaint to Schmidt and Bruno. Schmidt and Bruno then went to a dispatch center at a different location in order to access the Capitol Police's computer system, which is called "METRO." METRO is used by most police agencies in the Harrisburg area. Schmidt entered Officer Shaffer's complaint into METRO. Schmidt's entry summarized the complaint against Superintendent Shaffer, Dillard, and Rapak and selected type "A" for each of them, indicating a status of "Accused."

The parties dispute whether Schmidt knowingly violated Capitol Police regulations and policies in making the METRO entry. According to appellees, the dispatch center was outside of Schmidt's duty area, and permission was required for Schmidt to enter the center and use the METRO system. Schmidt claims that it was permissible for him to stop at the dispatch center on the way to his duty area and

_____

been resolved. Summary charges had been filed against a person who had pushed and shoved Commonwealth employees including Officer Shaffer. The charges were dismissed because Officer Shaffer failed to appear in court to testify regarding the charges. When Officer Shaffer was ordered to re-file the charges, he refused. He was notified that his refusal was being investigated and would be the subject of a pre-disciplinary conference scheduled for July 18, 2006.

that, while the order not to go into the center or use METRO without permission had been communicated to supervisors, it had not been communicated to him or other junior officers. Moreover, Schmidt had a log-in and password for METRO. The parties also dispute the significance of the "A" entries made by Schmidt. According to Schmidt, the "A" meant only that Shaffer had directly accused Superintendent Shaffer, Dillard, and Rapak. According to appellees, the "A" also meant that there was probable cause to arrest the three senior officers on sight. Schmidt did not believe that he needed to report the complaint up the chain of command before entering it into METRO. Appellees claim, however, that Capitol Police policy required Schmidt to report the complaint to his superiors before entering it.

After Superintendent Shaffer learned that Schmidt had entered the complaint into METRO, he directed Schmidt's supervisor, Sergeant Bistline, to make changes to the entry. Bistline printed out a copy of the complaint and then removed the entry from METRO. After learning of Bistline's actions, Schmidt confronted him, questioned him about removing the entry, and then told Bistline that he (Bistline) had "fucked up."

## B. Suspension of Schmidt

Following the incident, Superintendent Shaffer arranged a meeting with Gregory Green, Director of the Bureau of Human Resources (HR) in the DGS, to discuss allegations of misconduct against Schmidt. Superintendent Shaffer, Dillard, Rapak, and Connie Tennis (Chief of Labor Relations for HR) met with Green. The Superintendent asked HR to handle the investigation of Schmidt because the

7

Superintendent, Dillard, and Rapak were accused in the complaint that had been entered by Schmidt.[6] At Superintendent Shaffer's direction, Rapak conducted a preliminary investigation into Schmidt's conduct and provided his findings to Green and Tennis.[7]

Green concluded from the report that Schmidt had failed to report to his assigned post, had disobeyed work orders, and had showed disrespect and insubordination to his supervisor. According to Green, this misconduct was serious enough to raise "issues of trust" with respect to Schmidt. For that reason, he recommended that Schmidt be suspended pending further investigation. Green discussed the matter with Deputy Secretary of DGS Anne Rung, who was acting on authority delegated by DGS Secretary James Creedon. She approved Green's recommendation.

On July 18, 2006 – three days after Schmidt had entered the complaint into the METRO system – Schmidt was notified that he was suspended without pay from his position with the Capitol Police. Schmidt was called into an office by Dillard and several officers, told he was being suspended, and provided with a letter concerning his suspension. The letter, which was signed by Green on behalf of Secretary Creedon, explained that "the reason for this suspension was that you

_____

[6]Normally, Rapak, as head of the Office of Professional Responsibility, would be responsible for investigating allegations of misconduct by Capitol Police Officers.

[7]The record indicates that Rapak gathered information but did not conduct any analysis.

allegedly were involved in the entry of information into the 'METRO' system, which was intended to undermine the administration and operation of the Capitol Police." Included with the letter were excerpts from the Pennsylvania Civil Service Act concerning Schmidt's rights under the Act, including a provision stating that, while an external investigation is pending, an employee under investigation could be suspended until the investigation was complete and up to 30 days thereafter.[8] The letter did not identify any rules or regulations that had been violated by Schmidt.

The parties do not dispute that Schmidt was suspended without being provided a pre-disciplinary hearing. According to Schmidt, local newspapers learned of his suspension and reported that he had been suspended for filing false reports; he found this humiliating.

### C. Union Grievance and Investigation

Ten days after his suspension, Schmidt filed a grievance with his union, the Fraternal Order of Police, Lodge 85 (FOP), alleging that he had been suspended in violation of his constitutional right to due process. The FOP represented Schmidt in the grievance process, which went to arbitration. After holding a hearing and considering the parties' written submissions, on November 14, 2006, the arbitrator awarded Schmidt back pay, seniority, and benefits for the period starting with his suspension on July 18, 2006 through the date of the arbitral award.[9]

---

[8]*See* 71 Pa. Stat. § 741.803

[9]This description of the grievance proceedings is gleaned from the parties' statements of material facts and

9

During Schmidt's suspension, the OIG also conducted an investigation into Schmidt's conduct, and Schmidt was interviewed as part of the investigation. The OIG issued its report on February 5, 2007. The report concluded that Schmidt and several other officers had deliberately entered the complaint into METRO in an effort to embarrass and discredit the Capitol Police. The OIG found that Schmidt's statements lacked consistency and truthfulness and concluded that this called into question Schmidt's ability to effectively carry out his duties.

On March 2, 2007, after the OIG's report had been completed, Schmidt was notified by letter of a pre-disciplinary conference. The letter charged Schmidt with the following:

> Specifically, on July 15, 2006, you left your assigned duty post without permission, entered the ICMS area without authorization and entered information without authorization in the METRO system which was intended to undermine the administration and operation of the Capitol Police. In addition, after learning that Sgt. Bistline removed the information from

---

Schmidt's deposition. The collective bargaining agreement applicable to the Capitol Police and the papers from Schmidt's union grievance proceedings are not in the record before us. It appears that the arbitrator did not order Schmidt reinstated in the November 14 award. It was not until April 14, 2007 – after Schmidt's termination – that he was ordered reinstated.

> the METRO system, you became loud, argumentative and insubordinate towards Sgt. Bistline, used profanity and disrupted the workforce.

The letter did not specifically refer to any rules or regulations prohibiting this conduct.

On March 9, Schmidt participated in a pre-disciplinary conference with Tennis and representatives from the FOP. He declined to respond to the allegations against him or to provide an explanation for his alleged conduct. Schmidt contends that he could not respond to the charges because he had not been informed of the rules he allegedly violated. After the conference, Green recommended that Schmidt be terminated from the Capitol Police. On March 14, 2007, Schmidt was notified by letter that he was terminated.[10] The termination letter gave the same description of Schmidt's conduct as the March 2 notice of pre-disciplinary conference, and added: "These actions violated numerous provisions and procedures of the Capitol Police Duty Manual, which you are bound by and expected to follow." Schmidt invoked the FOP's grievance procedure to challenge his termination. An arbitrator ultimately ordered him reinstated, but without back pay, seniority, or benefits for the period during which he was terminated.

---

[10]In June, 2004, Schmidt had been suspended for three days without pay as discipline for making inappropriate comments. He invoked the FOP grievance procedure to challenge his suspension and was awarded back pay, but the suspension remained in effect. Green took this prior incident into account in deciding to terminate Schmidt.

### D. Suspension Litigation

On July 2, 2007, Schmidt filed a two-count complaint naming as defendants Superintendent Shaffer, Creedon, Green, and Tennis, alleging that they had suspended him from the Capitol Police without providing an adequate hearing in violation of his rights under the Due Process Clause of the Fourteenth Amendment (Count I), and terminated him in violation of his First Amendment rights (Count II).  Schmidt sought money damages under 42 U.S.C. §§ 1983 and 1985 for "embarrassment, humiliation, and mental anguish" resulting from his suspension and termination, as well as back pay, front pay, interest, and compensatory and punitive damages.

The District Court denied the defendants' motion to dismiss on April 24, 2008, and the parties proceeded to discovery.  On February 18, 2009, the District Court granted in part and denied in part the defendants' motion for summary judgment.  *Schmidt v. Creedon*, No. 4:07-cv-1190, Memorandum and Order at 22 (M.D. Pa. Feb. 18, 2009).  The court granted summary judgment on all of Schmidt's claims, except the due process claim arising from his suspension.[11]

---

[11]Summary judgment was granted on (1) Schmidt's claims under 42 U.S.C. § 1985, because Schmidt had produced no evidence that there was a conspiracy to suspend and terminate him motivated by race or class-based animus, *Schmidt*, No. 4:07-cv-1190, Memorandum and Order at 10 n.14; (2) his First Amendment retaliation claim because he failed to present any evidence other than temporal proximity showing that his termination resulted from his assertion of his

*Id.* at 19-21. The District Court dismissed Schmidt's claim arising from his termination because a due process claim for his termination was not pleaded in his complaint but was raised for the first time in his summary judgment papers.

The court then turned to the merits of Schmidt's suspension claim, citing *Board of Regents v. Roth*, 408 U.S. 564, 570 (1972), for the proposition that "[b]efore a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, 'except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *Schmidt*, No. 4:07-cv-1190, Memorandum and Order at 14. Defendants had argued that because Schmidt "was a police officer entrusted with a firearm and assigned to protect the public, issues of trust, credibility, and judgment are the types of extraordinary situations that implicate a valid government interest justifying the failure to provide predeprivation process." *Id.* at 12. The District Court found, however, that "a reasonable jury could infer that the three-day delay between the incident and the Plaintiff's suspension, coupled with the time consumed by coordinating and conducting the . . . meeting [in which Schmidt's suspension was discussed], indicates that the exigencies alleged by Defendants did not exist." *Id.* at 13-14.

---

constitutional rights through the union grievance and arbitration procedure, *id.* at 19-22; and (3) his claims against Superintendent Shaffer because he failed to present sufficient evidence that Shaffer was involved in the decision to suspend him, *id.* at 17-19. Schmidt does not challenge these rulings on appeal.

Defendants then moved for reconsideration of the denial of summary judgment, arguing that the union grievance procedures available to Schmidt constituted a constitutionally adequate alternative to a pre-deprivation hearing. The District Court agreed:

> In *Jackson v. Temple University*, 721 F.2d 931, 933 n.2 (3d Cir. 1983), the Third Circuit held that an arbitration proceeding provided an "alternative forum" that provided plaintiff with "essentially the same due process safeguards that would have been available through an unbiased hearing." In such circumstances, the Third Circuit has held that the dictates of due process have been satisfied because "the risk of an erroneous determination in the grievance/arbitration procedure is not large, and the value of an additional or substitute procedures is not great." *Dykes v.* [*SEPTA*], 68 F.3d 1564, 1572 (3d Cir. 1995).

*Schmidt v. Creedon*, No. 4:07-cv-1190, Memorandum and Order at 4-5 (M.D. Pa. Mar. 24, 2009). Because Schmidt had access to union grievance procedures to challenge his suspension, the court found this "type of post-deprivation process afforded to Plaintiff cures the defects in pre-deprivation due process he received such that it brings the totality of Defendants' conduct relative to Plaintiff's suspension within the bounds of the Due Process Clause of the Fourteenth Amendment." *Id.* at 5. Accordingly, the District Court granted summary judgment to appellees on Schmidt's remaining claim. *Id.* at 6. Schmidt appealed the judgment of the District Court.

14

### E. Termination Litigation

While his appeal was pending, Schmidt filed a new complaint against the same defendants alleging that he had been terminated without due process. Schmidt claimed that, because the notice of pre-disciplinary hearing only "vaguely asserted" the charges against him and did not identify the specific rules he was alleged to have violated, he was not given a true opportunity to defend himself at his pre-termination hearing. The District Court found that Schmidt's due process claim for his termination was not barred by *res judicata* because he had not had an opportunity in the prior litigation to fully and fairly litigate it. *Schmidt v. Creedon*, No. 09-cv-323, 2010 WL 411330, *5-6 (M.D. Pa. Jan. 25, 2010).[12] On the merits, the court agreed with the defendants that there was no evidence that Shaffer was involved in Schmidt's termination and that due process did not require that Schmidt be informed of the specific rules he was alleged to have violated at or prior to his pre-termination hearing. *Id.* at *4-5, *7. Schmidt again appealed. We have consolidated Schmidt's appeals and decide both in this opinion.

## II. Discussion

### A. Jurisdiction and Standard of Review

The District Court had jurisdiction over both actions

---

[12]Because we will affirm the District Court's determination that Schmidt was not denied due process in the notice provided prior to the termination hearing, we will not revisit the issue of *res judicata*.

15

brought by Schmidt under 28 U.S.C. § 1331, and we have jurisdiction over the District Court's final orders disposing of Schmidt's claims under 28 U.S.C. § 1291. "We review de novo district court orders granting or denying summary judgment," *Elassaad v. Independence Air, Inc.*, 613 F.3d 119, 124 (3d Cir. 2010), "apply[ing] the same test required of the district court and view[ing] inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party." *Bayer v. Monroe Cnty. Children and Youth Servs.*, 577 F.3d 186, 191 (3d Cir. 2009). Our review is not limited to the reasoning of the court below and we "may affirm the district court on grounds different from those relied on by the district court." *In re Mushroom Transp. Co.*, 382 F.3d 325, 344 (3d Cir. 2004).

## B. Schmidt's Suspension Claim

Appellees' assertion of qualified immunity shapes our analysis of Schmidt's suspension claim. Under the rule in *Saucier v. Katz*, 533 U.S. 194, 201 (2001), we consider first whether "the facts alleged show the officer's conduct violated a constitutional right" and then, "if a violation could be made out . . . the next, sequential step is to ask whether the right was clearly established."[13]

---

[13]*Pearson v. Callahan*, 555 U.S. 223, 230 (2009), limited *Saucier*, holding that "[b]ecause the two-step *Saucier* procedure is often, but not always, advantageous, the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case." For reasons that will become evident, the two-step *Saucier* procedure is the more helpful one in considering Schmidt's

16

**1.** *Absent Extraordinary Circumstances, Schmidt Had the Right to a Pre-Suspension Hearing*

The Fourteenth Amendment provides that a State may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. A procedural due process claim is subject to a "two-stage" inquiry: (1) whether the plaintiff has "a property interest protected by procedural due process," and (2) "what procedures constitute 'due process of law.'" *Gikas v. Wash. Sch. Dist.*, 328 F.3d 731, 737 (3d Cir. 2003). The parties agree that the first prong is met: Schmidt had a constitutionally protected property interest in not being terminated or suspended from his position as a Capitol Police Officer without good cause. *See Dee*, 549 F.3d at 230 (concluding that, under the Pennsylvania civil service statute, 53 Pa. Stat. § 46190, a fireman has a property interest in not being suspended without just cause).

The question here is whether the procedure followed in suspending Schmidt comports with due process. In assessing what process is due, this Court considers the factors set out in *Mathews v. Eldridge*:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural

suspension claim.

17

safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335 (1976); *see Dee*, 549 F.3d at 232 (applying *Mathews* framework to fireman suspended without pre-deprivation hearing). Although "[d]ue process is flexible and calls for such procedural protections as the particular situation demands," *Mathews*, 424 U.S. at 334, several general principles guide application of the *Mathews* test. One "essential principle" is that "a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"[14] *Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 220 (3d Cir. 2009) (quoting *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985)). Accordingly, "[o]nly in 'extraordinary situations where some valid government interest is at stake' is it permissible to postpone the hearing until after the deprivation has already occurred." *Dee*, 549 F.3d at 233 (quoting *Roth*, 408 U.S. at 570 n.7).

As we have set out above, under Pennsylvania law, a policeman's property interest in his job is protected from either termination or suspension, 71 Pa. Stat. §§ 741.803, 807, and due process therefore entitles him to a pre-suspension or

---

[14]On the day he was suspended, Schmidt was provided with a letter explaining why he was being suspended without pay. Schmidt does not claim that this notice was insufficient and thus we limit our analysis to whether Schmidt was entitled to a hearing prior to his suspension.

pre-termination hearing – albeit a brief and informal one. *See Dee*, 549 F.3d at 233; *Gniotek v. City of Philadelphia*, 808 F.2d 241, 243 (3d. Cir. 1986). We therefore reaffirm our holding in *Dee* that, absent extraordinary circumstances, policemen cannot be suspended without pay unless there has been a pre-suspension hearing.

*Gilbert v. Homar*, 520 U.S. 924 (1997), does not alter our analysis. There, the Supreme Court held that a police officer, who had been arrested and charged with drug possession, could be immediately suspended without a prior hearing. *Gilbert* is not applicable here for two reasons. First, the Court reasoned in *Gilbert* that because "the purpose of any pre-suspension hearing would be to assure that there are reasonable grounds to support the suspension," and because "an independent third party [had already] determined that there [was] probable cause to believe the employee committed a serious crime," there was adequate "assur[ance without a pre-suspension hearing] that the state employer's decision to suspend the employee was not 'baseless or unwarranted.'" *Id.* at 933-34. Here, Schmidt was only accused of wrongdoing by his superiors, and no such assurance would exist without a pre-suspension hearing. Second, the policeman in *Gilbert* was a university employee, and the parties did not address whether he was protected by the Civil Service Act. The Court thus assumed without deciding that "the suspension infringed a protected property interest," and therefore focused on the University's contention that the policeman "received all the process he was due." *Id.* at 929. Here, unlike the situation in *Gilbert*, it is conceded that Schmidt is a police officer subject to the Civil Service Act, which provides that both termination and suspension must be for cause, and are subject to similar

criteria, indicating that both implicate interests of comparable importance.

Furthermore, we note that providing an opportunity to be heard prior to suspension without pay would not impose a significant administrative or fiscal burden on the Commonwealth of Pennsylvania. Ordinarily, a pre-deprivation hearing "need not be elaborate." *Loudermill*, 470 U.S. at 545. Where adequate post-deprivation procedures are available, an employee is entitled only to "notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* The hearing can be informal and "need not definitively resolve the propriety" of the deprivation. *Id.* "It should be an initial check against mistaken decisions – essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* An employee is generally not entitled to notice of the reasons for his discharge in advance of a pre-deprivation hearing, *Gniotek*, 808 F.2d at 244, or to present his case to an impartial decision-maker at such a hearing, *McDaniels v. Flick*, 59 F.3d 446, 460 (3d Cir. 1995). Appellees do not claim that providing such limited pre-suspension hearings would impose any administrative or fiscal burden on the Commonwealth.[15]

_____

[15]We note that the standard applicable to suspension with pay is a more difficult question that we do not consider here. *See Loudermill*, 470 U.S. at 544-45 & n.10 ("in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending with pay"); *Dee*, 549 F.3d at 231 n.10 ("the fact that [the employee] was suspended with pay may—but

We therefore conclude that, absent extraordinary circumstances, due process requires notice and a hearing prior to suspension without pay, even where union grievance procedures, after the fact, fully compensate erroneously suspended employees.[16]

Appellees contend that our decisions in *Dykes v. SEPTA*, 68 F.3d 1564, 1575 (3d Cir. 1995), and *Jackson v. Temple University*, 721 F.2d 931 (3d Cir. 1983), hold that adequate post-deprivation grievance procedures render a pre-deprivation hearing unnecessary. We disagree. These cases stand for the proposition that certain defects in post-deprivation union grievance procedures do not violate due process because state law already provides remedies for such defects. Specifically, "[w]here a due process claim is raised against a public employer, and grievance and arbitration procedures are in place, . . . those procedures satisfy due process requirements 'even if the hearing conducted by the Employer . . . [was] inherently biased.'" *Dykes*, 68 F.3d at 1571 (quoting *Jackson*, 721 F.2d at 931). Neither case supports the broader claim advanced by appellees that a pre-deprivation hearing is unnecessary when post-deprivation union grievance and arbitration procedures are available.

---

need not necessarily—be found to affect the *Mathews v. Eldridge* balancing analysis").

[16]Because we hold, *infra*, that Schmidt's right to a pre-suspension hearing was not clearly established, we do not consider whether extraordinary circumstances justifying suspension without a prior hearing were present in this case.

21

The issue in both *Dykes* and *Jackson* was the sufficiency of the post-deprivation union grievance procedures, not whether a pre-deprivation hearing was required. Although it appears from the facts of both cases that the employees were not provided hearings prior to their termination, this argument was not raised on appeal in either case and it is apparent from our opinions in these cases that we did not consider it. Because we did not consider the availability of a pre-deprivation hearing in *Dykes* and *Jackson*, and our reasoning did not address the contention that the employees in those cases were entitled to such a hearing, these cases cannot be read as holding that the availability of post-deprivation union grievance procedures relieves a public employer of the obligation to provide an employee with a hearing prior to his termination or suspension without pay. *See generally IFC Interconsult, AG v. Safeguard Intern. Partners, LLC.*, 438 F.3d 298, 311 (3d Cir. 2006) (holding of a case includes only the facts and reasoning essential to the holding).

## 2. *Schmidt's Right to a Pre-Suspension Hearing Was Not Clearly Established*

Although absent extraordinary circumstances, Schmidt had a right to a hearing prior to his suspension, appellees are entitled to qualified immunity because this right was not clearly established at the time of his suspension. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "'This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition,' and turns on

22

the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Bayer*, 577 F.3d at 192 (quoting *Pearson*, 555 U.S. at 231).

We begin our analysis by considering the clearly established legal rules at the time Schmidt was suspended in July of 2006. The Supreme Court's decision in *Loudermill*, 470 U.S. at 542, clearly established that, absent extraordinary circumstances, certain state employees were entitled to a hearing prior to termination. Cases from this Court also made clear that this rule applied to police officers. *See, e.g., Gniotek*, 808 F.2d at 244. However, it was not clearly established in 2006 whether this rule applied when appropriate post-suspension union grievance procedures were available to suspended employees. *Loudermill* made clear that a pre-termination hearing was required even when a post-termination administrative hearing was available, but *Loudermill* dealt with termination, not suspension. We note that the District Court carefully considered the question and essentially concluded that *Loudermill* did not apply to Schmidt's suspension, holding that, under *Dykes* and *Jackson*, the availability of the post-suspension union grievance process "cured" any failure to provide a pre-suspension hearing.[17]

---

[17]A district court's error of law at step one of the *Saucier* procedure is relevant, but not dispositive, when considering whether a right is clearly established. In some cases, a lower court's error is simply an oversight, rather than evidence that the law is not clearly established. *See, e.g., Dee*, 549 F.3d at 230 (finding that employee's suspension clearly implicated due process concerns despite lower court's

In addition to our cases and decisions of the Supreme Court, "we routinely consider decisions by other Courts of Appeals as part of our 'clearly established' analysis when we have not yet addressed the right asserted by the plaintiff." *Williams v. Bitner*, 455 F.3d 186, 192-93 (3d Cir. 2006) (collecting cases). At the time of Schmidt's suspension, other circuits had concluded that "due process requires pre-termination notice and an opportunity to respond even where a [collective bargaining agreement] provides for post-termination procedures that fully compensate wrongfully terminated employees." *Chaney v. Suburban Bus Div. of the Regional Transp. Auth.*, 52 F.3d 623, 629 (7th Cir. 1995); *see also Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) (hearing required prior to demotion of employee, even where post-demotion union grievance procedures were available); *Cotnoir v. University of Me. Sys.*, 35 F.3d 6, 12 (1st Cir. 1994) (hearing required prior to termination of employee, even where post-termination union grievance procedures were available). These cases did not clearly establish that Schmidt was entitled to a hearing before being suspended – as opposed to being terminated.

In light of the closeness of the question, the absence of clear precedent in this or other circuits, and the District

---

finding of no due process protections), *vacating and remanding* 2007 U.S. Dist. LEXIS 21448 (M.D. Pa. Mar. 7, 2007); *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004) (finding that excessively tight handcuffs violated clearly established Fourth Amendment law despite lower court's finding of no excessive force), *rev'g* 230 F. Supp. 2d 619, 622 (E.D. Pa. 2002).

Court's thoughtful conclusion, we cannot say that "it would be clear to a reasonable [official] that his conduct was unlawful in the situation" presented to appellees in this case. *Saucier*, 533 U.S. at 202. Accordingly, the appellees are entitled to qualified immunity and the District Court correctly granted summary judgment to the appellees on Schmidt's suspension claim.

### C. Schmidt's Termination Claim

Schmidt's termination claim is much more straightforward than his suspension claim. We agree with the District Court's holding that Schmidt was provided with adequate process before he was discharged. As we have explained above, a pre-termination hearing "need not be elaborate." *Loudermill*, 470 U.S. at 545. An employee is entitled to "notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* "The pretermination hearing may be informal so long as it affords the employee an opportunity to make any 'plausible arguments that might . . . prevent discharge.'" *Fraternal Order of Police Lodge No. 5 v. Tucker*, 868 F.2d 74, 79 (3d Cir. 1989).

We have specifically addressed the adequacy of notice provided to police officers in a pre-disciplinary hearing in two cases. *See Copeland v. Phila. Police Dep't*, 840 F.2d 1139 (3d Cir. 1988); *Gniotek*, 808 F.2d at 244. In *Gniotek*, police officers participated in a hearing prior to their suspension and subsequent termination for accepting bribes. *Id.* at 244-45. At the hearing, each officer was provided a form stating "We are questioning you concerning testimony presented in Federal Court under oath by Eugene Boris an admitted

25

number writer, that he paid $60 per month for an extended period beginning in 1982 for protection of his illegal activities." *Id.* at 244. We held:

> This statement, clearly, gave Gniotek notice of the charges and nature of the evidence against him. It was of such specificity to allow Gniotek the opportunity to determine what facts, if any, within his knowledge might be presented in mitigation of or in denial of the charges . . . [U]nder the standards enunciated in *Loudermill*, this notice satisfied the demands of due process.

*Id.* at 244.

In *Copeland*, a police department received allegations that a police officer was using drugs and requested that the officer provide a urine sample for drug testing. 840 F.2d at 1142-43. In an interview with a police inspector, the officer was informed that his urinalysis showed that he had been using drugs. *Id.* at 1145. The officer declined to comment and two days later he was suspended and given a notice of suspension with intent to dismiss. *Id.* We held that the inspector's statement provided the officer with sufficient notice of the grounds for his suspension for due process purposes, even though the officer was not informed of the details of his urinalysis test and did not learn of the formal charges against him until two days after the interview. *Id.* at 1145-46.

There is no dispute that Schmidt was given prior notice of the hearing which described in sufficient detail the conduct that was the basis for his suspension. Schmidt's only

objection is that appellees did not identify the specific rules that they claimed his conduct violated. In light of the simple notices we upheld in *Gniotek* and *Copeland*, we conclude that the notice provided to Schmidt of the termination hearing did not violate due process.[18]

### III. Conclusion

For the above reasons, we will affirm the orders of the District Court, granting judgment to the appellees in both actions brought by Schmidt.

---

[18]In light of this holding, we need not address whether Schmidt provided sufficient evidence of Superintendent Shaffer's involvement in his termination.