**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 17-3396

———————

ANTHONY P. FALCO, as Chief of Police of
the City of Hoboken and individually,

Appellant

v.

DAWN ZIMMER, in her capacity as Mayor of the City of
Hoboken and individually; CITY OF HOBOKEN, a municipal corporation;
JON TOOKE, in his capacity as Director of
Public Safety for the City of Hoboken and individually

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil Action No. 2-13-cv-01648)
District Judge: Hon. Madeline C. Arleo

———————

Argued
November 14, 2018

———————

Before: GREENAWAY, JR., SHWARTZ, and BIBAS, *Circuit Judges*.

(Opinion Filed:  April 11, 2019)

John W. Bartlett
Jason F. Orlando [Argued]
Murphy Orlando
30 Montgomery Street
11th Floor
Jersey City, NJ 07302
        *Counsel for Appellant*

Victor A. Afanador [Argued]
Jonathan M. Carrillo
Francis A. Kenny
Lite DePalma Greenberg
570 Broad Street
Suite 1201
Newark, NJ 07102
        *Counsel for Appellee Dawn Zimmer*

Thomas B. Hanrahan [Argued]
David J. Pack
Suite 2
80 Grand Avenue
River Edge, NJ 07661
        *Counsel for Appellees City of Hoboken and Jon Tooke*

_____

OPINION [*]

_____


GREENAWAY, JR., *Circuit Judge*.

This case arises out of long-standing disagreements between Anthony Falco

("Falco"), the former Chief of Police of the Hoboken Police Department ("HPD"), and

Dawn Zimmer ("Zimmer"), the former Mayor of Hoboken. Falco generally alleges that

Zimmer; Jon Tooke ("Tooke"), the former Director of Public Safety ("DPS") of

_____

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

Hoboken; and the City of Hoboken ("Hoboken" and, collectively, "Appellees") interfered with his operation of the HPD and withheld his benefits because he often criticized Zimmer and supported her political opponents. Falco filed this lawsuit against Appellees, bringing claims for, *inter alia*, First Amendment retaliation and procedural due process violations. After the District Court dismissed his case for the third time, Falco now appeals to us. We determine here that the District Court erred in articulating and applying the relevant legal standard to Falco's First Amendment retaliation claims, but did not err in assessing Falco's procedural due process claims. Accordingly, we will reverse in part and affirm in part the District Court's orders and remand this case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Origins of the Dispute

After approximately 38 years of rising through the ranks of the HPD, Falco became Chief of Police on June 18, 2009. The New Jersey Department of Community Affairs appointed Falco to this position, as Hoboken was under the control of a state fiscal monitor at the time due to its failure to adopt a budget. In the months leading up to his appointment, Falco had publicly supported then-Councilman Peter Cammarano ("Cammarano") in his campaign for Mayor of Hoboken against then-Councilwoman Zimmer by attending fundraisers, strategy sessions, and door to door canvassing on his behalf. After a bitter campaign, Cammarano narrowly defeated Zimmer by fewer than 200 votes in a run-off election on June 9, 2009, and became Mayor of Hoboken on July 1, 2009. But, less than a month later, Cammarano was arrested on federal corruption

3

charges and thus forced to resign. Then-Council President Zimmer was thereafter appointed Acting Mayor on July 30, 2009; elected Mayor on November 6, 2009; and reelected Mayor in November 2013.

At the heart of Falco's case is his assertion that he experienced a series of retaliatory actions because of his political differences with, and statements critical of, Zimmer. Falco alleges that Zimmer harbors political animus against him because he is a member of "Old Hoboken," comprised of "individuals and local public servants whose families have resided in Hoboken for generations," whereas she is a member of "New Hoboken," comprised of "young professionals . . . who are more likely to commute to finance and professional jobs in New York City and who have moved to Hoboken as adults from other cities or towns." App. 177. Because of this animus, Zimmer allegedly opposed Falco's original appointment to Chief of Police while she was Councilwoman and then worked with Tooke to take action against Falco once she became Mayor.

## B. Falco's Allegedly Protected Activity

As to his First Amendment retaliation claims, Falco offers a smorgasbord of allegedly protected activity that he claims led Appellees to retaliate against him: (1) being a member of Old Hoboken; (2) supporting Cammarano in the election for Mayor of Hoboken in November 2009 and other political rivals of Zimmer in the 2010, 2011, and 2013 municipal elections; (3) reporting the improper conduct of civilian officials in the Zimmer administration to the Hudson County Prosecutor in June 2010; (4) opposing Zimmer's budget reduction plan that called for HPD layoffs by publicly speaking against the plan at a meeting with Zimmer in July 2010 and a Hoboken City

4

Council meeting in September 2010; (5) associating with Our Lady of Grace Catholic Church ("OLG") and appointing its pastor, Father Alexander Santora ("Santora"), who had been critical of Zimmer in church bulletins and regional newspapers, to be Chaplain of the HPD in 2010; (6) having his daughter, an HPD officer, arrest Ian Sacs ("Sacs"), the then-Director of the Hoboken Parking Authority and member of Zimmer's cabinet, for improperly commandeering a Hoboken vehicle and getting into an altercation with the driver in March 2011; (7) initiating this lawsuit in March 2013; (8) deciding to assign Kenneth Ferrante ("Ferrante"), the then-Lieutenant of the HPD and one of Zimmer's political allies, to a nighttime shift in October 2013; (9) testifying pursuant to a subpoena in his official capacity as Chief of Police in *Alicea v. Hoboken*, a state court discrimination and retaliation lawsuit filed by Angel Alicea ("Alicea"), a former DPS of Hoboken, against Zimmer, in which Falco was extensively questioned about his allegations in the instant lawsuit in December 2013; and (10) refusing to countenance improper civilian interference in the day-to-day operations of the HPD and its ongoing investigations throughout his term as Chief of Police.

### C. Appellees' Alleged Retaliation

Falco alleges that, in response to his protected activity, Appellees retaliated against him in several ways. First, Falco alleges that Appellees interfered in the daily operations of the HPD from 2009 to 2011. In particular, Falco alleges the following acts of interference: (1) "micro-manag[ing]" the HPD and attempting to "marginalize" him, *id.* at 183; (2) Alicea's writing him a memorandum criticizing him for failing to notify the Department of Public Safety of an ongoing, confidential investigation; (3) Alicea's

5

distributing a confidential investigation report to civilian Hoboken employees and the media; (4) Alicea's filing a request under the Open Public Records Act ("OPRA"), N.J. Stat. Ann. §§ 47:1A-1 to -18, to obtain video recordings of an altercation that occurred inside HPD headquarters; (5) Alicea's seeking the HPD's roll calls, confidential lists that indicate which police officers are deployed in what locations; (6) Hoboken's Law Director's ordering an investigation into the HPD after a police officer was invited to a political event; and (7) Hoboken's Office of Corporation Counsel's "intimidat[ing]" an Acting Chief of the HPD into disclosing confidential information while Falco was on vacation, App. 188. Falco claims that these actions violate N.J. Stat. Ann. § 40A:14-118, which articulates that the Chief of Police has direct responsibility for the efficiency and routine, day-to-day operations of the HPD.

Second, Falco alleges that Appellees retaliated by canceling Hoboken's 2012 St. Patrick's Day Parade, an event for which OLG and Santora—whom Falco had previously appointed to be Chaplain of the HPD—had long served as custodians.

Third, Falco alleges that Appellees denied him a written contract in 2012. According to Falco, Appellees denied his request for a written contract specifying his employment terms so that they could fiddle with his compensation depending on whether he adhered to their political agenda. Falco claims that Appellees' denying him a written contract violated both Hoboken's pattern and practice over 40 years with other Chiefs of Police—including several of Falco's immediate predecessors and his immediate successor—and N.J. Stat. Ann. § 40A:11-14, which he avers requires that his contract have been in writing.

Fourth, Falco alleges that Appellees retaliated by both outright denying him various benefits and delaying the disbursement of other benefits in 2012, 2013, and into his retirement in 2014. Because he did not have a formal employment contract with Hoboken, Falco claims that Appellees denied him two benefits in 2012 that are customarily given to superior officers of the HPD, each of which he had received in prior years: an annual uniform stipend of $1,300 and an annual attendance incentive, or sick incentive, of $1,500. In addition to Appellees' continued non-payment of these two compensation items in 2013, Falco claims that Appellees also denied him an annual court time and preparation benefit of $500, which he had received in previous years, after his testimony in *Alicea*. Falco further claims that, even though other superior officers of the HPD received 1.95% pay increases in January 2013, he did not receive such an increase, allegedly in violation of N.J. Stat. Ann. § 40A:14-179, until he filed the instant lawsuit in March 2013. He also alleges that, in 2013, he was denied five days' pay for working certain overtime shifts during Superstorm Sandy. Finally, Falco claims that Appellees delayed the disbursement of his accrued compensation upon retirement and, when they did eventually pay him, he received an amount "substantially less" than the over $400,000 to which he claims entitlement. App. 209–10.

In sum, Falco presents a narrative of an acrimonious relationship between him and Appellees over the course of his tenure as Chief of Police. On July 1, 2014, after more than 42 years of service, Falco retired from the HPD, having reached the mandatory retirement age of 65. According to Falco, Appellees' retaliation has deprived him of hundreds of thousands of dollars in compensation and the opportunity to end an

7

honorable career with dignity.

## D. Procedural History

As a result, Falco filed this lawsuit on March 18, 2013, while still serving as Chief of Police.[1]  After two years of motions practice and extensions, Falco filed his second amended complaint, asserting 42 causes of action.  The District Court dismissed the second amended complaint but allowed Falco to refile certain claims, including those raising First Amendment retaliation and equal protection violations, but not others, including those raising procedural due process violations.  Subsequently, Falco filed his third amended complaint, asserting 19 causes of action.  The District Court then dismissed the third amended complaint but again permitted him to replead his First Amendment retaliation claims.  Consequently, Falco filed his fourth amended complaint, asserting a sole cause of action for First Amendment retaliation.  Yet again, the District Court dismissed the fourth amended complaint, this time with prejudice.

In its opinions, the District Court determined that Falco failed to allege sufficient facts to demonstrate First Amendment retaliation or procedural due process violations. On the former claims, the District Court principally held that (1) many of Falco's claims of retaliation occurred before he engaged in protected activity; (2) Falco only has a "unilateral expectation" to the benefits he claims were taken in retaliation for his

---

[1] On January 26, 2016, while the instant lawsuit was pending in the District Court, Falco filed a substantially similar case raising state law claims against Appellees in the Superior Court of New Jersey, Law Division in Hudson County ("Superior Court").  At the time the parties briefed the instant appeal, the state court case was ongoing.  Since then, however, that case has been adjudicated in Appellees' favor on summary judgment.

8

protected activity, *id.* at 56 (citation omitted); (3) much of the alleged retaliation by Appellees was *de minimis*; (4) Falco's association with Old Hoboken does not constitute protected political association because the group is amorphous and non-political; and (5) the alleged retaliation would not deter a person of ordinary firmness from speaking, as evidenced by Falco's continued engagement in speech critical of Appellees.

On the latter claims, the District Court essentially held that (1) Falco does not have a constitutionally protected property interest in the benefits to which he claims entitlement; (2) Falco has not sufficiently alleged that his salary was reduced in violation of N.J. Stat. Ann. § 40A:14-179; and (3) Falco has alleged nothing more than an "abstract need or desire" for various incidental benefits, App. 11 (citations omitted).

Falco now appeals to us, seeking reinstatement of the First Amendment retaliation claims in his second and fourth amended complaints and the procedural due process claims in his second amended complaint. Specifically, Falco asks us to reinstate (1) counts 25 to 32 of the second amended complaint, which claim First Amendment free speech and association retaliation under 42 U.S.C. § 1983; (2) count 1 of the fourth amended complaint, which claims First Amendment free speech retaliation under 42 U.S.C. § 1983; (3) counts 1 to 6 and 9 of the second amended complaint, which claim procedural due process violations under 42 U.S.C. § 1983; (4) count 33 of the second amended complaint, which claims conspiracy to violate civil rights under 42 U.S.C. § 1985; and (5) count 42 of the second amended complaint, which claims attorneys' fees and costs under 42 U.S.C. § 1988.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a). We have appellate jurisdiction under 28 U.S.C. § 1291 and review the District Court's grants of Appellees' motions to dismiss *de novo*. *McTernan v. City of York, Pa.*, 564 F.3d 636, 646 (3d Cir. 2009) (citing *Omnipoint Commc'ns Enters., L.P. v. Newtown Twp.*, 219 F.3d 240, 242 (3d Cir. 2000)).

In conducting a *de novo* review of the District Court's orders, we accept as true all of the well-pleaded allegations in Falco's second and fourth amended complaints and draw all reasonable inferences in Falco's favor. *See McGovern v. City of Phila.*, 554 F.3d 114, 115 (3d Cir. 2009) (citing *Miller v. Fortis*, 475 F.3d 516, 519 (3d Cir. 2007)). Falco's factual allegations, however, "must be enough to raise a right to relief above the speculative level" to one that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) (citation omitted). As a result, the District Court's judgments are proper only if, accepting all of Falco's well-pleaded allegations as true and construing the complaints in the light most favorable to Falco, we determine that Falco is not entitled to relief under any reasonable reading of the complaints. *See McGovern*, 554 F.3d at 115 (citing *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008)).

## III. DISCUSSION

This appeal presents us with three chief issues, the first of which is procedural and the latter two of which are substantive: (A) whether we may consider evidence outside of the District Court's record that Falco presents for the first time in his opening brief on appeal, (B) whether Falco has stated any plausible First Amendment retaliation claims,

10

and (C) whether Falco has stated any plausible procedural due process claims.  We address each issue in turn.

### A. We Decline to Consider Evidence Outside the District Court's Record

In his opening brief, Falco includes and relies upon several pieces of evidence not part of the record before the District Court, including that (1) Falco testified in a Superior Court deposition that he was discouraged from exercising his First Amendment rights as a result of Appellees' punishment; (2) Vincent Lombardi, the former President of the Hoboken Policemen's Benevolent Association ("PBA"), testified that Zimmer had "probably" engaged in "retaliation against the [C]hief for cooperating with the union" against Zimmer's budget reduction plan that called for HPD layoffs, Appellant's Br. 21; (3) Falco's forensic accountant's report estimated that Falco's damages resulting from Appellees' retaliation amounted to approximately $1,000,000, excluding attorneys' fees and costs; (4) Alicea testified that he targeted Falco for harassment to please Zimmer; (5) Falco has been prescribed medication to treat the anxiety he developed in the workplace; (6) Arch Liston ("Liston"), the former Business Administrator of Hoboken, testified in a Superior Court deposition that Falco should have received the same uniform allowance and attendance incentive as Police Superior Officers Association ("PSOA") members; and (7) Falco continued to have police union dues deducted from his paycheck like other PSOA members, even after Appellees began withholding certain elements of his compensation.

Falco himself "acknowledges that this [evidence], adduced either while discovery was proceeding in this action or in the related Superior Court action, was not part of the

11

record before the District Court below." *Id.* at n.5. But he argues that, "in the interests of justice and fairness," it is important to bring this particular evidence to our attention to demonstrate both the prematurity of dismissal and that the District Court incorrectly made factual inferences adverse to Falco. *Id.* Appellees respond by arguing that we should disregard Falco's additional submissions because he never filed a motion to supplement the record on appeal. Falco replies by citing case law that allegedly stands for the proposition that an appellate court may expand the record by taking judicial notice of new developments not considered by the lower court, as procedural rules are devised to promote justice. We, however, decline to do so.

As a general matter, as we have said on "numerous occasions," we "cannot consider material on appeal that is outside of the district court record." *In re Capital Cities/ABC, Inc.'s Application for Access to Sealed Transcripts*, 913 F.2d 89, 96 (3d Cir. 1990) (collecting cases). But this rule "is subject to the right of an appellate court in a proper case to take judicial notice of new developments not considered by the lower court." *United States v. Lowell*, 649 F.2d 950, 966 n.26 (3d Cir. 1981) (quoting *Landy v. Fed. Deposit Ins. Corp.*, 486 F.2d 139, 151 (3d Cir. 1973)).

The proper process for expanding the record—beyond merely correcting errors or omissions—is through a motion for leave to supplement the record on appeal. *See Biliski v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 574 F.3d 214, 224 n.10 (3d Cir. 2009). In determining whether exceptional circumstances exist such that such a motion should be granted, we consider:

12

(1) whether the proffered addition would establish beyond any doubt the proper resolution of the pending issue; (2) whether remanding the case to the district court for consideration of the additional material would be contrary to the interests of justice and the efficient use of judicial resources; and (3) whether the appeal arose in the context of a *habeas corpus* action.

*Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 226 (3d Cir. 2009) (quoting *Capital Cities*, 913 F.2d at 97). But we need not exercise any such inherent equitable power to expand the record if a party has not sought leave to supplement the record. *Capital Cities*, 913 F.2d at 97 (declining to expand the record beyond what the lower court considered where the appellant did not file a motion for leave to supplement the record on appeal).

Here, Falco has not filed a motion for leave to supplement the record on appeal. As we did in *Capital Cities*, we therefore decline to expand the record by considering evidence that was not before the District Court. Falco's invocation of the principles of justice and fairness are to no avail where he has not followed the proper process.

## B. Falco States Some Plausible First Amendment Retaliation Claims

In its orders dismissing his second and fourth amended complaints, the District Court dismissed all of Falco's First Amendment retaliation claims—the first time, some without prejudice and, the second time, all with prejudice. However, our *de novo* review of Falco's First Amendment retaliation claims demonstrates that portions of them must survive this stage of the litigation.

13

<u>i. The District Court Incorrectly Articulated the Elements of a</u>
<u>First Amendment Retaliation Claim by a Public Employee</u>

As an initial matter, the parties disagree on the elements of a First Amendment

retaliation claim. Relying on *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir.

2006), Falco states that, in order to state a First Amendment retaliation claim, he must

sufficiently allege two elements: that (1) the activity in question is protected by the First

Amendment and (2) the protected activity was a substantial factor in the alleged

retaliatory action. Citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267

(3d Cir. 2007), and *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006), Appellees,

on the other hand, state that Falco must allege three elements in order to state a valid First

Amendment retaliation claim: that (1) he engaged in a protected activity, (2) Appellees'

retaliatory action was sufficient to deter a person of ordinary firmness from exercising his

rights, and (3) there exists a causal connection between the protected activity and the

retaliatory action.

Unfortunately, the parties talk past each other on this issue, never addressing the

difference in stated elements and proving unhelpful when prompted at oral argument.

The District Court, moreover, vacillated between the two articulations, employing

Falco's version in its opinion dismissing Falco's second amended complaint but

inexplicably changing course and employing Appellees' version in its opinion dismissing

Falco's fourth amended complaint.

A review of our jurisprudence on such claims reveals that the District Court was

correct in the first instance and incorrect in the second instance: Falco's, not Appellees',

14

version of the elements is applicable here because Falco was a public employee when he experienced the alleged First Amendment retaliation. *DeFlaminis*, the primary case Appellees cite in support of their position, concerned private citizens who brought a First Amendment retaliation claim against a government entity and its employees. 480 F.3d at 263–65, 267 (articulating Appellees' version of the elements for a First Amendment retaliation claim where parents brought suit against a school district, superintendent, and director of pupil services). In contrast, *Hill*, the sole case Falco cites in support of his position, concerned a public employee who brought a First Amendment retaliation claim against his public employer. 455 F.3d at 230, 241 (articulating Falco's version of the elements for a First Amendment retaliation claim where a former borough manager brought suit against a borough and its former mayor). Indeed, our prior decisions demonstrate that Falco's articulation of the elements is correct where a First Amendment retaliation claim is brought by a public employee, whereas Appellees' version is appropriate where such a claim is brought by a private citizen. *Compare De Ritis v. McGarrigle*, 861 F.3d 444, 453 n.5 (3d Cir. 2017) (applying Falco's formulation to a public employee's case), *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 466 (3d Cir. 2015) (same), *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 986 (3d Cir. 2014) (same), *Gorum v. Sessoms*, 561 F.3d 179, 184–85 (3d Cir. 2009) (same), *and Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002) (same) *with Thomas*, 463 F.3d at 296 (applying Appellees' formulation to a private citizen's case), *and Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (same).

Because the claims in the instant case arise out of Falco's former position as Chief of the HPD—in which even Appellees concede he was a public employee—Falco's articulation of the elements controls here. Though, in their application, both iterations of the elements boil down to similar core considerations, we proceed with Falco's version in light of the above discussion.

That said, Falco's version of the elements is still incomplete. More fully, "[t]o establish a First Amendment retaliation claim, a public employee must show that (1) his [activity] is protected by the First Amendment and (2) the [activity] was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the [activity] had not occurred." *Munroe*, 805 F.3d at 466 (quoting *Dougherty*, 772 F.3d at 986); *accord Gorum*, 561 F.3d at 184 (articulating the same elements for other types of First Amendment activity, not just speech). "The first factor is a question of law; the second factor is a question of fact." *Gorum*, 561 F.3d at 184 (quoting *Hill*, 455 F.3d at 241).

ii. Falco Has Waived First Amendment Retaliation Claims Arising from His Associations

Throughout the various stages of this litigation, including now on appeal, Falco has alleged a panoply of protected activities. As an initial matter, however, we must review the procedural history of this case to discern which of the alleged activities are still potentially viable.

As background, Falco's second amended complaint stated eight counts of First Amendment retaliation. Those counts were each generically titled "Violation of 42

16

U.S.C. § 1983 – First Amendment" but, in the text of each count, Falco alleged violations of both his First Amendment free speech and association rights. App. 121–27. In its order dismissing the second amended complaint, the District Court dismissed all but two of those counts with prejudice. Falco refiled those latter two claims in his third amended complaint, where they were titled "Violation of 42 U.S.C. § 1983—Freedom of Speech" and "Violation of 42 U.S.C. § 1983—Freedom of Religion," respectively. *Id.* at 158–59. Again, the District Court dismissed the third amended complaint, this time dismissing all of Falco's claims without prejudice. Subsequently, Falco filed his fourth amended complaint—the live, operative complaint as to his First Amendment retaliation claims— which includes a sole count titled "Violation of 42 U.S.C. § 1983—First Amendment (Free Speech)." *Id.* at 173.

Whereas the second and third amended complaints explicitly pled and plentifully referenced free association claims, *e.g., id.* at 122 ("[Appellees'] actions . . . violated the rights . . . guaranteed to [Falco] . . . including without limitation the right to free speech *and association* (emphasis added)); *id.* at 157 ("[Hoboken's] decision . . . is the latest example of [Appellees'] . . . retaliatory and unlawful acts against []Falco for, among other things, his political speech and associations . . . ."), the fourth amended complaint contains only few, passing mentions to such claims, *see id.* 172–212 (only once referencing "associations," but only in explaining Falco's political background, and rarely referencing "affiliations," only in passing). More importantly, by its own language—and as Falco's counsel conceded at oral argument, *see* Oral Arg. Audio 47:50–48:00—the fourth amended complaint only alleges a single count of First

17

Amendment free speech retaliation. Falco has therefore abandoned any free association claim.

Yet, on appeal, Falco presses claims for both "protected speech and association" retaliation. Appellant's Br. 20. At oral argument, Falco's counsel seemed to overlook these pleading deficiencies, seeking to revive, among others, "all of the First Amendment [retaliation] claims in the second amended complaint." Oral Arg. Audio 47:02–47:29. But that he cannot do because the free association claims Falco made in his second amended complaint were dismissed by the District Court without prejudice but Falco did not replead them in his fourth amended complaint. *See Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 973 n.14 (9th Cir. 2013) ("[Plaintiff] originally brought a claim for equitable indemnity, which the district court dismissed with *leave to amend*. Because [Plaintiff] did not voluntarily renew these claims, however, it effectively abandoned them." (emphasis in original) (citation omitted)); *Shakeri v. ADT Sec. Servs., Inc.*, 816 F.3d 283, 291 (5th Cir. 2016) (noting that "a failure to replead claims after being granted leave to replead constitutes waiver of any such claims on appeal" (citations omitted)).

Consequently, we cannot review any of Falco's alleged instances of protected activity for potential protected association. Instead, Falco is bound by the terminology he used in the operative fourth amended complaint, which plainly alleges a sole count for free speech retaliation.

<u>iii. Falco Successfully Pleads That He Engaged
in Some First Amendment Protected Speech</u>

*a. Relevant Law*

As a general rule, a public employee's speech is protected by the First Amendment "when (1) in making it, the employee spoke as a citizen[;] (2) the statement involved a matter of public concern[;] and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Hill*, 455 F.3d 241–42 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).  A public employee does not speak "as [a] citizen[]" when he makes a statement "pursuant to [his] official duties." *Garcetti*, 547 U.S. at 421. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Rankin v. McPherson*, 483 U.S. 378, 384–85 (1987) (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)).

1. Private Citizen or Public Employee

Whether Falco acted as a private citizen or a public employee for purposes of his speech turns on whether he engaged in the relevant activity pursuant to his job duties in the HPD.  In order to be protected by the First Amendment, a plaintiff's activity ordinarily must not have been undertaken pursuant to his job responsibilities as a public employee. *Garcetti*, 547 U.S. at 421–22 (citation omitted).  Unfortunately, the Supreme Court has not "articulate[d] a comprehensive framework for defining the scope of an employee's duties," but it has stressed:

19

The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id.* at 424–25.

In *Garcetti*, the Supreme Court explained that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. That case concerned a deputy district attorney who wrote a dispositional memorandum in which he recommended dismissing a prosecution based on an improper search warrant. *Id.* at 414–15. The district court there had concluded that, because the statements were made pursuant to the prosecutor's official job duties, they were not protected speech. *Id.* at 415. The Ninth Circuit reversed, holding that the speech was inherently a matter of public concern and that it did not unduly disrupt the operations of the prosecutor's office. *Id.* at 415–16.

The Supreme Court reversed the Ninth Circuit, holding that courts must first inquire as to whether a public employee spoke as a citizen or in his role as an employee. *Id.* at 417–18. The Supreme Court stressed that whether the speech at issue "concern[s] the subject matter of [the speaker's] employment" is "nondispositive," because the First Amendment "protects some expressions related to the speaker's job." *Id.* at 421 (citations omitted). Instead, the "controlling factor" is whether the statements were "made pursuant to [the speaker's] duties," that is, whether such utterances were among

20

the things that the employee "was employed to do." *Id.* Applying the law to the facts before it, the Supreme Court found that the prosecutor's preparing the memorandum at issue constituted unprotected public employee speech because it was made in the course of his ordinary job responsibilities. *Id.* at 424.

In *Reilly v. City of Atlantic City*, we applied *Garcetti* in determining whether a police officer's participation, including trial testimony, in investigations against his superiors was speech protected by the First Amendment. 532 F.3d 216, 219, 225 (3d Cir. 2008). We held there that, when testifying truthfully in court proceedings, a public employee speaks as a citizen, even if the court testimony stems from the employee's official duties in an investigation. *Id.* at 231 ("[T]he act of offering truthful testimony is the responsibility of every citizen, and the First Amendment protection associated with fulfilling that duty of citizenship is not vitiated by one's status as a public employee. That an employee's official responsibilities provided the initial impetus to appear in court is immaterial to his/her independent obligation as a citizen to testify truthfully.").

In *Lane v. Franks*, the Supreme Court endorsed *Reilly*. *See* 573 U.S. 228, 235 (2014). That case concerned the director of a community college program who was terminated for providing truthful, sworn testimony under subpoena to a grand jury regarding another public employee he had terminated for fraud, even though the testimony concerned matters related to the director's job. *Id.* at 232–34. In deciding that the public employee's speech was entitled to First Amendment protection, the Supreme Court clarified that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it *merely concerns*

21

those duties." *Id.* at 240 (emphasis added). Motivated by the "considerable value" in "encouraging, rather than inhibiting, speech by public employees," *id.* at 236, the Supreme Court held that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes, . . . even when the testimony relates to his public employment or concerns information learned during that employment." *Id.* at 238. But the Supreme Court reserved the question of whether this would also be true for testimony given as "part of a public employee's ordinary job duties." *Id*. at n.4.

In sum, if a public employee's speech is part of his ordinary job duties, the employee is acting as a public employee and his activity is thus not protected under the First Amendment. If, however, the public employee's speech is not part of his ordinary job duties or is uttered as sworn testimony in a judicial proceeding, then the employee is acting as a private citizen and his speech hence may or may not be protected under the First Amendment, depending on the second step of the analysis.

2. Public Concern or Private Concern

Assuming Falco acted as a private citizen, whether his speech is protected under the First Amendment next turns on whether or not the activity involved a matter of public concern or private concern. Whereas a public employee's speech involving matters of public concern are protected, speech involving matters of private concern are not protected. *See De Ritis*, 861 F.3d at 454–55 (citations omitted).

Activity involves matters of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it

22

'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations omitted). By contrast, activity does not involve a matter of public concern when it relates solely to "mundane employment grievances." *Munroe*, 805 F.3d at 467 (citation omitted). Courts determine whether an employee's speech involves public concern by reference to the speech's "content, form, and context," *Lane*, 573 U.S. at 241 (quoting *Connick*, 461 U.S. at 147–48), which encompasses "the employee's motivation as well as whether it is important to our system of self-government that the expression take place," *Munroe*, 805 F.3d at 467 (citations omitted).

Because courts are not to "make a superficial characterization of the speech or activity taken as a whole," they must conduct "a particularized examination of each activity for which the protection of the First Amendment is claimed" to determine whether it involves a matter of public concern, *Johnson v. Lincoln Univ. of Commonwealth Sys. of Higher Educ.*, 776 F.2d 443, 451 (3d Cir. 1985), while taking care not to "'cherry pick' something that may impact the public while ignoring [its] manner and context," *Munroe*, 805 F.3d at 467 (citation omitted). If, for example, a discrete unit of speech addresses only the employee's own problems and, even if those problems "brush ever so gently against a matter of public concern" by virtue of that employee's public employment, then that speech is merely a "personal grievance." *Miller v. Clinton Cty.*, 544 F.3d 542, 551 (3d Cir. 2008).

In *Connick*, the Supreme Court first ruled that it is "unnecessary . . . to scrutinize the reasons" for alleged retaliation if a public employee's activity "cannot be fairly

23

characterized as constituting speech on a matter of public concern." 461 U.S. at 146. That case concerned an assistant district attorney who was fired when, after a forced transfer, she circulated a questionnaire to other employees regarding the transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work on political campaigns. *Id.* at 140–41. Recognizing that "government offices could not function if every employment decision became a constitutional matter," *id.* at 143, the Supreme Court stated that federal courts have a responsibility to "ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment . . . ." *Id.* at 147. Accordingly, the Supreme Court held that the survey questions—except one asking about feeling pressure to work on political campaigns—were not protected speech because they involved a personal grievance rather than a matter of public concern. *Id.* at 148.

More recently, in *Lane*, the Supreme Court determined that a public employee's testimony regarding corruption in a public program and misuse of state funds "obviously involve[d] a matter of significant public concern." 573 U.S. at 241 (citing *Garcetti*, 547 U.S. at 425). According to the Supreme Court, "the form and context of the speech— sworn testimony in a judicial proceeding—fortif[ied] that conclusion." *Id.*

Our and the Supreme Court's jurisprudence is replete with cases concerning criticism of public employers by public employees. *See, e.g.*, *Pickering v. Bd. of Educ.*, 391 U.S. 563, 566 (1968); *Czurlanis v. Albanese*, 721 F.2d 98, 104 (3d Cir. 1983). Collectively, these cases indicate that "speech disclosing public officials' misfeasance is

24

protected while speech intended to air personal grievances is not." *Swineford v. Snyder Cty. Pa.*, 15 F.3d 1258, 1271 (3d Cir. 1994) (citing *Czurlanis*, 721 F.2d at 103).

In sum, if a public employee's speech (1) is not part of his ordinary job duties or concerns speech uttered but (2) does not involve a matter of political, social, or other concern to the community, the speech is not protected under the First Amendment. If, however, the speech (1) is not part of the public employee's ordinary job duties or is uttered as sworn testimony in a judicial proceeding and (2) involves a matter of political, social, or other concern to the community, the speech may be protected under the First Amendment, depending on the third and final step of the analysis.

3. Public Employer Lacks or Has Adequate Justification

Assuming Falco spoke as a private citizen and his activity addressed a matter of public concern, we must determine whether or not Appellees had an adequate justification for treating Falco differently from any other member of the general public. *Garcetti*, 547 U.S. at 418 (citing *Pickering*, 391 U.S. at 568). In conducting this step of the analysis, courts balance "the public employee's interest in speaking about a matter of public concern and the value to the community of [his] being free to speak on such matters" against "the government's interest as an employer in promoting the efficiency of the services it performs through its employees." *Azzaro v. Cty. of Allegheny*, 110 F.3d 968, 980 (3d Cir. 1997) (citing *Green v. Phila. Housing Auth.*, 105 F.3d 882, 885 (3d Cir. 1997); *Watters v. City of Phila.*, 55 F.3d 886, 891–92 (3d Cir. 1995); and *Versarge v. Twp. of Clinton, N.J.*, 984 F.2d 1359, 1366 (3d Cir. 1993)); *accord Brennan v. Norton*, 350 F.3d 399, 413 (3d Cir. 2003) (explaining that courts should "consider the nature of

the relationship between the employee and the employer as well as any disruption the employee's speech may cause, including the impact of the speech on the employer's ability to maintain discipline and relationships in the work place" (citation omitted)); *Baldassare v. State of N.J.*, 250 F.3d 188, 198 (3d Cir. 2001) ("[T]he public's interest in exposing potential wrongdoing by public employees is especially powerful."). If the public employer's interest is "significantly greater" than the public employee's interest in contributing to public debate, then the public employee's speech is not protected. *De Ritis*, 861 F.3d at 456–57 (quoting *Pickering*, 391 U.S. at 573).

In *Pickering*, the Supreme Court held that a public school teacher's letter to the editor of a local newspaper concerning a school budget constituted speech on a matter of public concern. 391 U.S. at 571, 574–75. In balancing the public employee's interest in such speech against the government's efficiency interest, the Supreme Court declared that the publication of the letter did not "impede[] the teacher's proper performance of his daily duties in the classroom" or "interfere[] with the regular operation of the schools generally." *Id.* at 572–73. The Supreme Court therefore held that the teacher's speech was protected under the First Amendment and thus could not serve as the basis for his dismissal. *Id.* at 574.

In sum, if a public employee's speech (1) is not part of his ordinary job duties or is uttered as sworn testimony in a judicial proceeding and (2) involves a matter of political, social, or other concern to the community but (3) the government's interest in promoting the efficiency of its services is significantly greater than the employee's interest in speaking about the matter and the value to the community of his being able to do so, then

26

the speech is not protected under the First Amendment.  If, however, the speech (1) is not part of his ordinary job duties or is uttered as sworn testimony in a judicial proceeding, (2) involves a matter of political, social, or other concern to the community, and (3) the government's interest in promoting the efficiency of its services is not significantly greater than the employee's interest in speaking about the matter and the value to the community of his being able to do so, then the speech is protected under the First Amendment.

### b. Application

In light of this relevant law, some but not all of Falco's alleged instances of protected speech satisfy the first element of a plausible First Amendment retaliation claim.  In particular, three of Falco's ten examples of allegedly protected speech are indeed protected under the First Amendment.  The remaining seven, however, fall by the wayside.  Here, we review all ten instances of allegedly protected speech in chronological order, individually clarifying which are and are not protected under the law.

### 1. Membership in Old Hoboken

First, Falco offers his membership in Old Hoboken as an instance of protected activity.  But this is a non-starter since group membership is a matter of association.  *See Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973) (citations omitted).  Because, as previously discussed, we are precluded from reviewing Falco's allegations for protected free association claims, this instance of claimed protected activity is unavailing.

## 2. Political Support for Zimmer's Opponents

Second, Falco points to his support for Cammarano and other political rivals of Zimmer in municipal elections of 2009, 2010, 2011, and 2013 as instances of protected activity. Specifically, in his fourth amended complaint, Falco alleges that he "supported . . . Cammarano . . . by attending public and private political events including, but not limited to, fundraisers, strategy sessions, and reaching out to communities near [Falco's] residence by going door-to-door in *vocal support* of Cammarano and his running-mates." App. 177 (emphasis added). He also alleges that he generally "support[ed] . . . political rivals of []Zimmer, both before and during her service as Mayor and his as Chief." *Id.* at 175.

Falco must first allege that he engaged in the activity as a private citizen, not as a public employee. Although Falco does not explicitly allege that supporting political candidates is outside the ordinary job duties of his former positions in the HPD, we must here draw a reasonable inference in Falco's favor: supporting political candidates is presumably outside the ordinary job duties of HPD officers. Falco therefore overcomes the first step of the analysis, as he engaged in the activity as a private citizen instead of as a public employee.

Falco must next allege that this activity involved a matter of political, social, or other concern to the community. Supporting political candidates in municipal elections is squarely within these parameters. Thus, Falco overcomes the second step of the analysis, as he engaged in activity of public, not private, concern.

28

Falco must finally allege that Appellees did not have an adequate justification to treat him differently than any other member of the general public. Unfortunately, neither the parties nor the District Court discussed this component of classifying public employee activity as free speech. Instead, the District Court perfunctorily assumed this activity constituted protected speech and the parties elide the complexities of the issue in their briefs. We, hence, must draw reasonable inferences in Falco's favor here.

As an initial matter, political participation is a quintessential civic duty, giving substantial weight to Falco's side of the test. Moreover, restricting public employees from engaging politically is contrary to bedrock principles of civic society—and, more relevant here, does not seem to promote the efficiency of government services. At the very least, we cannot say that Appellees' interest in promoting their services' efficiency significantly outweighs Falco's interest in engaging politically and the community's interest in having citizens, especially community leaders, be politically active. Consequently, Falco's support of Cammarano and other political rivals of Zimmer in municipal elections properly classifies as protected First Amendment activity.

### 3. Report to Hudson County Prosecutor

Third, Falco offers his report against Zimmer administration officials to the Hudson County Prosecutor in June 2010 as an instance of protected activity. In the report, Falco chronicled the Department of Public Safety's various forms of interference in the HPD and sought advice moving forward. In order for this activity to be protected, Falco must first allege that he engaged in it as a private citizen, not as a public employee. In the absence of Falco's explicitly alleging that reporting other officials in government is

29

outside the ordinary job duties of the Chief of the HPD, we are once more left to our own devices.

Here, we cannot reasonably draw the inference that reporting allegedly improper interference in the HPD is outside the Chief of Police's responsibilities. Indeed, N.J. Stat. Ann. § 40A:14-118, which Falco claims Appellees' interference violated, itself states that the "[C]hief of [P]olice . . . shall be the head of the police force and that he shall be directly responsible to the appropriate authority for the efficiency and routine day[-]to[-]day operations thereof . . . pursuant to policies established by the appropriate authority." It would not make sense for, on the one hand, the Chief of Police to be in charge of running the day-to-day operations of the HPD based on the policies established by appropriate authorities but, on the other hand, it be outside his job responsibilities to inquire from an appropriate authority as to how he should respond to perceived interference with his exclusive role. This activity can be reasonably interpreted only as one squarely within Falco's ordinary job duties. As a result, this activity is unprotected under the First Amendment.

### 4. Opposition to Zimmer's Budget Reduction Plan

Fourth, Falco points to his opposition to Zimmer's budget reduction plan that called for HPD layoffs, including speaking against the plan at a meeting with Zimmer in July 2010 and at a Hoboken City Council meeting in September 2010, as further instances of protected activity. But again, Falco does not allege that his opposition was outside his ordinary job duties and we cannot reasonably infer that it was. For one, Zimmer explicitly asked Falco to provide an HPD budget that could reduce costs by $2

30

million. Moreover, he articulated his opposition to Zimmer's budget reduction plan in documents he sent to her and other municipal staff in March and July 2010. Lastly, he spoke against the plan at a Hoboken City Council meeting attended by "hundreds of HPD officers and officers' family members." App. 193. Because Falco seemingly acted within his ordinary job duties in opposing Zimmer's budget reduction plan, we cannot deem this instance as constituting protected speech activity.

### 5. Association with OLG and Appointment of Santora

Fifth, Falco offers his association with OLG and appointment of Santora to be Chaplain of the HPD in 2010 as protected activity. But neither instance passes muster. First, as discussed previously, we cannot review Falco's allegations regarding his associations, including those with OLG. Second, Falco's appointment of Santora as Chaplain was certainly within Falco's job duties as a public employee. Falco concedes as much when, in his fourth amended complaint, he states: "As Chief of Police, [Falco] named . . . Santora to be the Chaplain of [the] HPD in or about 2010." *Id.* at 195. This statement must be interpreted to mean that Falco appointed Santora to the position as part of his official duties as Chief of the HPD. Hence, because Falco engaged in the activity as a public employee, he cannot obtain First Amendment protection for it.

### 6. Arrest of Sacs after Altercation

Sixth, Falco points to the arrest of Sacs by his daughter, an HPD officer, as another instance of protected activity. However, Falco cannot seek free speech protection for this activity for at least two reasons. First, Falco does not allege that he, himself, engaged in the activity; instead, he articulates that the arrest was effected only by his

31

daughter. But, even assuming that making an arrest somehow qualifies as speech, one cannot claim First Amendment protection for the speech of another. *See Easton v. Sundram*, 947 F.2d 1011, 1015 (2d Cir. 1991) ("[Plaintiff's] claim thus fails at the outset because *he himself* has not engaged in conduct deserving of [F]irst [A]mendment protection . . . ." (emphasis added)). Second, drawing reasonable inferences in Falco's favor, we must still conclude that effectuating arrests is squarely within the job parameters of the Chief of Police. For these two independent reasons, we cannot consider this to be an activity protected under the First Amendment.

### 7. Initiation of the Instant Lawsuit

Seventh, Falco offers his initiating this lawsuit in March 2013 as an instance of protected speech activity. As a threshold matter, we must determine whether this activity properly qualifies as speech, to which our review in this case is limited. Generally, the act of suing a public employer may fall under either the Speech Clause or Petition Clause of the First Amendment, as the two clauses embody "cognate rights." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011) (quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945)). The Supreme Court has indicated, however, that filing a lawsuit qualifies as speech if a plaintiff "allege[s] that his employer retaliated against him for the speech contained within his . . . lawsuit." *Id.* at 387. Here, Falco has done just that by alleging that Appellees retaliated against him for, among other things, the "numerous allegations of unlawful, unconstitutional, and retaliatory behavior" by Appellees set forth in his "initial complaint." App. 204, 206. In any event, Appellees do not contest that Falco's filing this lawsuit constitutes speech activity.

32

Although Appellees also do not contest that this activity constitutes *protected* speech, we nonetheless undertake the full analysis. As to the first step of the analysis, we can reasonably infer that Falco's filing this action was not within his ordinary job responsibilities, especially in light of Supreme Court precedent on the subject. *Cf. Lane*, 573 U.S. at 238 ("Sworn testimony in judicial proceedings is a quintessential example of speech as a citizen for a simple reason: Anyone who testifies in court bears an obligation, to the court and society at large, to tell the truth." (citations omitted)). As to the second step of the analysis, we must determine whether filing the instant case involved a matter of public concern. Here again, our precedent supports Falco's position. *See Green*, 105 F.3d at 888 ("[A]ll court appearances are matters of public concern. That is so because all court appearances implicate the public's interest in the integrity of the truth seeking process and the effective administration of justice.").

The final step calls for balancing Appellees' interest in ensuring the efficiency of their services against Falco's interest in accessing the courts and the community's value in allowing all aggrieved parties to seek legal redress. Again, the parties have not briefed this issue so we must draw reasonable inferences on our own. But it appears that Falco has a strong interest in vindicating his constitutional rights whereas Appellees, at best, have an interest in ensuring the efficient operation of the Hoboken government, in which lawsuits such as Falco's could pose burdens.

In *Green*, we determined that a housing authority police officer's First Amendment interest in testifying as a character witness for an organized crime associate was outweighed by the housing authority's interest in successfully fighting drugs and

33

crime, protecting the safety of its officers and other members of the community, fostering trust and confidence among officers, and protecting its reputation. *Id.* at 887–89. Here, by contrast, Appellees have stated no justification for treating Falco differently than any ordinary member of the public. Unarmed with any such justifications and nonetheless bound to draw reasonable inferences in Falco's favor, we must thus determine that, on balance, Falco's interests are stronger. Therefore, Falco's initiation of the instant lawsuit constitutes speech protected under the First Amendment.

### 8. Assignment of Ferrante to Night Shift

Eighth, Falco points to his decision to assign Ferrante to a nighttime shift in October 2013 as an additional instance of protected activity. But this activity cannot overcome the first step of the requisite analysis. Although Falco has not alleged whether shift decisions are within or outside his ordinary job responsibilities, N.J. Stat. Ann. § 40A:14-118 sheds light on this matter. The statute's plain language denotes that the Chief of Police is "directly responsible" for the "routine day[-]to[-]day operations" of the HPD. *Id*. Personnel management is clearly within the parameters of routine, day-to-day operations. We can thus reasonably infer only that Falco engaged in this activity as a public employee, rendering it unprotected under the First Amendment.

### 9. Testimony in *Alicea*

Ninth, Falco avers that his testimony pursuant to a subpoena in his official capacity as Chief of Police in *Alicea*, where he was questioned at length about his allegations in the instant lawsuit, is another instance of protected activity. At first blush, determining whether such testimony classifies as protected speech activity seems murky

34

in light of *Garcetti*. Although *Garcetti* broadly proclaimed that statements by public employees pursuant to their official duties are not protected by the First Amendment, 547 U.S. at 421, *Lane* narrowed its bounds, 573 U.S. at 239–41. In particular, *Lane* distinguished sworn testimony in judicial proceedings, the speech at issue there, as being "far removed" from the contents of office memoranda, the speech at issue in *Garcetti*. *Id.* at 239. On this basis, *Lane* specifically held that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes . . . even when the testimony relates to [the] public employment or concerns information learned during that employment." *Id.* at 238. Still, it reserved the question of whether this is also true for testimony given as "part of a public employee's ordinary job duties." *Id.* at n.4.

Our jurisprudence, however, has already answered that question. In *Reilly*, we held that a public employee speaks as a citizen when testifying truthfully in court proceedings, even if the court testimony stems from his official duties. 532 F.3d at 231. Nothing in *Lane* disturbs this.[2]

---

[2] Indeed, albeit in dicta, *Lane* supports this proposition:

> Sworn testimony in judicial proceedings is a quintessential example of speech as a citizen for a simple reason: Anyone who testifies in court bears an obligation, to the court and society at large, to tell the truth. When the person testifying is a public employee, he may bear separate obligations to his employer—for example, an obligation not to show up to court dressed in an unprofessional manner. But any such obligations as an employee are distinct and independent from the obligation, as a citizen, to speak the truth. That independent obligation renders sworn testimony speech as a citizen and sets it apart from speech made purely in the capacity of an employee.

As a result, the factual dispute over whether Falco's testimony in *Alicea* was within his ordinary job duties as Chief of the HPD is of no moment. Either way, Falco's testimony qualifies as citizen speech. We must therefore continue to consider the next steps of the protected activity analysis.

Falco's testimony in *Alicea* also satisfies the second step of the analysis. The content of Falco's testimony—alleged discrimination and retaliation by Zimmer and Hoboken—clearly involves a matter of significant public concern. *See Swineford*, 15 F.3d at 1271 (articulating that "speech disclosing public officials' misfeasance is protected" (citing *Czurlanis*, 721 F.2d at 103)); *see also Snyder*, 562 U.S. at 453 (explaining that speech involves a matter of public concern when "it is a subject of legitimate news interest" (internal quotation marks and citations omitted)). Moreover, "the form and context of the speech—sworn testimony in a judicial proceeding—fortify that conclusion." *Lane*, 573 U.S. at 241.

Finally, Falco's *Alicea* testimony survives the analysis' third step. Here, we must decide whether Appellees "had an adequate justification for treating [Falco] differently from any other member of the general public" based on their needs as employers. *Garcetti*, 547 U.S. at 418 (citing *Pickering*, 391 U.S. at 568). But Appellees' side of the *Pickering* scale is entirely empty. Like the public employer in *Lane*, Appellees "do not assert, and cannot demonstrate, any government interest that tips the balance in their favor. There is no evidence, for example, that [Falco's] testimony . . . was false or

_____

573 U.S. at 238–39 (internal citations omitted).

erroneous or that [Falco] unnecessarily disclosed any sensitive, confidential, or privileged information while testifying." *Lane*, 573 U.S. at 242. Having satisfied each step of the analysis, Falco's testimony in *Alicea* is therefore entitled to First Amendment protection.

### 10. Refusal to Allow Interference with HPD

Tenth, Falco points to his refusal to countenance interference from civilian employees, especially those aligned with Zimmer, in the day-to-day operations of the HPD as a final instance of protected activity. But this activity is unprotected under the First Amendment for the same reason Falco's report of Zimmer administration officials to the Hudson County Prosecutor is unprotected. As discussed previously, N.J. Stat. Ann. § 40A:14-118 places responsibility for the day-to-day operations of the HPD directly on the shoulders of the Chief of Police. It would not follow for the Chief to be in charge of running the day-to-day operations of the HPD but it not be within his ordinary job duties to prevent others from interfering in the day-to-day operations of the HPD. This activity can thus can be reasonably interpreted as one within Falco's ordinary job duties. Because of this, it is unprotected under the First Amendment.

\* \* \*

Overall, only three of Falco's offered activities—(1) his vocal support for political opponents of Zimmer in 2009, 2010, 2011, and 2013; (2) his filing the instant lawsuit in March 2013; and (3) his testimony in *Alicea* in December 2013—are protected by the First Amendment. The remaining seven fail.

37

<u>iv. Falco Successfully Pleads That Some of His First Amendment Protected Speech Was a Substantial or Motivating Factor in Some of Appellees' Allegedly Retaliatory Acts</u>

*a. Relevant Law*

Having established that he engaged in at least some First Amendment protected activity, Falco next bears the burden of showing that his protected activity was a substantial or motivating factor in Appellees' alleged retaliation.  To do so, he must show some sort of "causal link" between the protected speech and the adverse employment action.  *See, e.g.*, *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (citations omitted); *see also Azzaro*, 110 F.3d at 981 (reversing summary judgment dismissing First Amendment retaliation claim because there existed "a material dispute of fact as to whether [plaintiff's] reports were a motivating factor in the discharge decision").

Generally, this element "presents a question of fact for the jury." *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005).  But, at this motion to dismiss stage, Falco must only produce some evidence, direct or circumstantial, of this element that is "enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555 (citation omitted).

The adverse action must be more than *de minimis*.  *See McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) ("[N]ot every critical comment—or series of comments—made by an employer to an employee provides a basis for a colorable allegation that the employee has been deprived of his or her constitutional rights." (citations omitted)).  However, "a plaintiff may be able to establish liability under § 1983 based upon a

38

continuing course of conduct even though some or all of the conduct complained of would be *de minimis* by itself or if viewed in isolation." *Brennan*, 350 F.3d at 419 n.16; *accord Suppan v. Dadonna*, 203 F.3d 228, 234 (3d Cir. 2000) ("[A] trier of fact could determine that a violation of the First Amendment occurred at the time of the rankings on the promotion lists and that some relief is appropriate even if plaintiffs cannot prove a causal connection between the rankings and the failure to promote."). In cases where the parties dispute whether an actionable adverse action occurred, the factfinder must determine whether "the alleged retaliatory conduct was sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights." *Suppan*, 203 F.3d at 235 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)); *accord O'Connor v. City of Newark*, 440 F.3d 125, 127–28 (3d Cir. 2006) (citations omitted).

"[F]or protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct." *Ambrose*, 303 F.3d at 493 (citation omitted). If Falco shows that Appellees were aware of the protected conduct, then he may use the temporal proximity between that knowledge and the adverse employment action to argue causation. "[A] suggestive temporal proximity between the protected activity and the alleged retaliatory action can be probative of causation," *Town of Hammonton*, 351 F.3d at 114 (citation omitted), but "[e]ven if timing alone could ever be sufficient to establish a causal link, . . . the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred," *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)).

That said, in order to show that the protected speech was a substantial or motivating factor in the alleged acts of retaliation, Falco need not show that the decision was motivated solely by anti-speech animus or even that the illegal animus was the dominant or primary motivation for the retaliation. *Suppan*, 203 F.3d at 236 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). This is less than a showing that Falco's protected conduct was the "but for" cause of the challenged actions. *Id.*

In *DeFlaminis*, a case involving retaliation claims under both the First Amendment and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–797b, we noted three options for proving a sufficient causal link:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. . . . In the absence of that proof the plaintiff must show [(3)] that from the evidence gleaned from the record as a whole the trier of the fact should infer causation.

480 F.3d at 267 (internal quotations and citations omitted).

Overall, distilling the several, aforementioned considerations as to this second element of a plausible First Amendment retaliation claim, we now review Falco's allegations of Appellees' retaliation for the following components: that (1) Appellees were aware of Falco's protected speech; (2) Appellees' acts of retaliation were not *de minimis*, but instead sufficient to deter a person of ordinary firmness from exercising his First Amendment rights; and (3) there exists a sufficient causal link between the protected speech and retaliatory acts.

*b. Application*

As a threshold matter, Falco posits that he is not required to show any proof of causation at this stage of the proceedings. But the cases on which Falco relies concern Title VII retaliation claims, not First Amendment retaliation claims. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 785 (3d Cir. 2016); *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 175 (3d Cir. 1997); *Robinson v. Se. Pa. Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 894 (3d Cir. 1993). Although the two contexts are similar, the elements of retaliation claims under the two laws differ. As a result, Falco must show a plausible causal connection at this stage.

Falco, however, offers a hodgepodge of retaliatory acts, largely without tying any specific act to any particular protected activity. Construing the facts in Falco's favor, we must therefore parse through the record to determine whether any of these protected activities were a substantial or motivating factor in any of Appellees' allegedly retaliatory acts. *But cf. Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 403–04 (6th Cir. 1992) (explaining that courts are not obliged to comb through the entire case, including many briefs and motions, to ferret out factual matters). We assess here each alleged retaliatory act in turn.

1. Interference in HPD's Routine Operations

First, Falco presents Zimmer and her allies' interference in the day-to-day operations of the HPD from fall 2009 to fall 2011 as retaliatory acts for which his First Amendment protected activities were a substantial or motivating factor. By that point,

41

Falco had neither filed this lawsuit nor testified in *Alicea*, so only his political support for political opponents of Zimmer could have formed the impetus for the alleged retaliation.

While Falco's allegations satisfy the first and third component considerations as to this element, they do not fulfill the second. Falco alleges that he publicly supported political opponents of Zimmer in an array of campaign activities, from fundraisers to door to door canvassing. It is reasonable for us to infer that Appellees would have learned of this, especially in light of the controversy surrounding Falco's appointment as Chief of Police at the time. *See* App. 179 (alleging that Zimmer opposed Falco's candidacy for Chief of Police "because [he] supported her political rivals"). Falco's first relevant engagement in this protected activity—in the spring and fall of 2009—also occurred in temporal proximity to when Appellees began interfering in the HPD.

But Falco's claim falters at the second stage. As explained previously, whether a retaliatory act is *de minimis* turns on whether it would be sufficient to deter a person of ordinary firmness from exercising his First Amendment rights. Falco here generally alleges that Appellees' interference—through, among other things, their disclosure of confidential police information to civilians, an inquiry into an internal HPD investigation, the filing of an OPRA request into the HPD, and requests for the HPD's roll calls—was substantial. But the District Court held it to be *de minimis*.

We agree with the District Court's determination. We deem interference by filing formal inquiries and requests more akin to "petty slights, minor annoyances, and simple lack of good manners," which are not actionable in an analogous legal context, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), than retaliation that

would deter an ordinary person from speaking out. We therefore conclude that Falco has not shown that his support of political opponents of Zimmer was a substantial or motivating factor in Appellees' interference in the day-to-day operations of the HPD.

## 2. Cancellation of St. Patrick's Day Parade

Second, Falco presents Zimmer's cancellation of the 2012 Saint Patrick's Day Parade as "[r]etaliation for [Falco's] [m]embership in [OLG and] [s]upport of []Santora." App. 194. Here, Falco points to a particular activity that he believes caused this alleged retaliation. In doing so, however, Falco illuminates a fatal flaw in this claim. As discussed previously, only retaliation claims relating to Falco's speech, not associations, are viable in this case at this point. We must therefore disregard such passing references to Falco's associations. Nonetheless, even if we are to construe this as a speech-related claim arising out of Falco's appointment of Santora as Chaplain, for the same reasons explained before, that appointment is not a protected activity because it was within Falco's ordinary job duties in the HPD. Accordingly, Falco's second instance of claimed retaliation is also unavailing.

## 3. Denial of Written Contract

Third, Falco points to Appellees' denial of his request for a written contract in 2012 as a retaliatory act for which his First Amendment protected activities were a substantial or motivating factor. At the time Appellees denied Falco's request for a written contract, the only protected activity in which Falco had engaged was his support for political opponents of Zimmer. This protected activity began in 2009, nearly three years before he alleges Appellees retaliated against him. The lapse of several years

43

between Falco's first engagement in the activity and Appellees' alleged retaliation fatally attenuates the causal connection between the two. Falco attempts to rehabilitate this temporal gap by pointing to the fact that Hoboken was under a state fiscal monitor at the beginning of his tenure as Chief of Police, thereby limiting Appellees' freedom to retaliate against him by denying him a contract. But Falco himself concedes, as he must, that the state fiscal management of Hoboken ended in 2010. Accordingly, there still exists an approximately two-year gap between Falco's first, most prominent political opposition to Zimmer and Appellees' denying him a written contract. Because of this temporal chasm, Falco cannot demonstrate either "an unusually suggestive temporal proximity" or "a pattern of antagonism coupled with timing." *DeFlaminis*, 480 F.3d at 267.

Falco's last resort is hence for the trier of fact to infer causation from "evidence gleaned from the record as a whole." *Id.* (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). But that, we determine, a reasonable trier of fact could not do in light of a record that evinces little to no other evidence of a causal link. We thus conclude that Falco's support for political candidates opposed to Zimmer was not a substantial or motivating factor of Appellees' denial of Falco's request for a written contract.

### 4. Withholding of Benefits

Fourth, Falco points to Appellees' denial or delay in disbursing various benefits in 2012, 2013, and 2014 as retaliatory acts for which his First Amendment protected activities were a substantial or motivating factor. As previously discussed, the benefits at

44

issue include Appellees' (1) belatedly disbursing to Falco (a) a 1.95% pay increase that other HPD officers received in 2013; and (b) an unspecified portion "substantially less" than the $400,000 allegedly owed to him as accrued compensation upon his retirement in 2014, App. 209–10; and (2) outright denying to Falco (a) an annual $1,300 uniform stipend in 2012, 2013, and 2014; (b) an annual $1,500 attendance incentive in 2012, 2013, and 2014; (c) a stipend for an unspecified amount for working shifts during Superstorm Sandy due in 2013; (d) a $500 court time and preparation benefit in 2014; and (e) an unspecified, "substantial[]" portion of the $400,000 allegedly owed to him as accrued compensation upon his retirement in 2014, *id.*

Again, Falco does not specify which protected activities relate to which retaliatory acts. So we must discern on our own whether any of the protected activities could have been the impetus for this alleged retaliation. Here, we find all three component parts met.

First, we can reasonably infer that Appellees were aware of Falco's conduct, as his support for political rivals of Zimmer, his filing this lawsuit, and his testimony in *Alicea* were all public activities.

Second, while some of the withheld benefits, such as the $500 court time and preparation benefit, may be *de minimis* individually, they collectively rise above the requisite threshold. *Brennan*, in particular, instructs us to consider the "cumulative impact" of Appellees' conduct on Falco's speech. 350 F.3d at 422 n.17. Here, we can say with ease that the cumulative monetary value at issue—an amount that, based on the allegations in Falco's fourth amended complaint, ranges between a few thousand and a

45

few hundred thousand dollars—is substantial and would deter a person of ordinary firmness from exercising his First Amendment rights.

At oral argument, counsel for Hoboken and Tooke insinuated that a deprivation of several thousand dollars would not chill the speech of an ordinary person. But that surprising argument does not dissuade us from reaching this conclusion. Indeed, the Supreme Court has also indicated, albeit in a different legal context, that values of a few thousand dollars are not *de minimis*. *See Hodel v. Irving*, 481 U.S. 704, 714 (1987) (determining, in the context of a Fifth Amendment takings dispute, that amounts of $1,816 and $2,700 are "not trivial sums"). As a result, the benefits that Appellees denied or delayed disbursing to Falco cumulatively rise above the threshold for actionability.

Third, the close temporal proximity between Falco's protected speech and Appellees' withholding the various benefits satisfies the causal component. For example, Falco alleges that, mere months after he filed the instant lawsuit in March 2013, Appellees denied him his Superstorm Sandy stipend in September 2013. Additionally, Falco claims that Appellees denied his benefit for court time and preparation in January 2014, less than a month after he testified in *Alicea* in December 2013. More generally, all of the deprivations and delays in disbursing Falco's benefits in 2012, 2013, and 2014 occurred in sufficient proximity to his supporting political opponents of Zimmer in 2011 and 2013. Appellees' depriving Falco of various benefits thus satisfies the third component of this element.

\* \* \*

46

As a final matter, we pause to address Falco's invocation of *Heffernan v. City of Paterson, N.J.*, 136 S. Ct. 1412 (2016), which he laments that the District Court did not once reference in its disposition of this case. Factually similar to the instant case, *Heffernan* concerned a New Jersey police officer who was demoted after he was seen carrying a yard sign for a political opponent of the city's incumbent mayor. *Id.* at 1416. The police officer's supervisors, however, demoted him based on a factual mistake: they believed he was involved in the political opponent's campaign but he was actually just picking up a yard sign for his bedridden mother. *Id.* As Falco characterizes the case, *Heffernan* held that "a retaliatory attempt to punish an employee's free speech violates the Constitution even if it does not actually 'coerce[ the employee] into changing' his 'political allegiance' or abridging his speech." Appellant's Br. 32 (citing *Heffernan*, 136 S. Ct. at 1419). In selectively quoting the language as such, Falco attempts to undermine the ordinary firmness standard used in determining whether a public employee's protected activity was a substantial or motivating factor in the employer's retaliation.

But Falco is incorrect for two chief reasons. First, the sentence Falco cites reads in full: "Hence, we do not require plaintiffs *in political affiliation cases* to 'prove that they, or other employees, have been coerced into changing, either actually or ostensibly, their political allegiance.'" *Heffernan*, 136 S. Ct. at 1419 (emphasis added) (citation omitted). The instant case, however, is not a free association case, but a free speech one, rendering the cited language inapplicable.

Second, relying on this passing reference to how the potential harm of a constitutional violation may extend to other employees who may be discouraged from

47

engaging in protected activities, Falco asserts that we must focus on this externalized harm, even if it upends decades of precedent outlining other considerations in the analysis. But *Heffernan*'s central holding—that, "[w]hen an employer demotes an employee out of a desire to prevent the employee from engaging in political activity that the First Amendment protects, the employee is entitled to challenge that unlawful action under the First Amendment and []§ 1983 . . . even if . . . the employer makes a factual mistake about the employee's behavior," *id.* at 1418—has no bearing on this case. For these reasons, *Heffernan* is merely a factually similar case that turns on an entirely separate legal question. It is therefore inapposite here and the District Court rightly disregarded it.

\* \* \*

Nonetheless, although most of Falco's allegations regarding Appellees' potentially retaliatory acts do not satisfy the second element of a First Amendment retaliation claim, one does. In particular, Falco has carried his burden of alleging with sufficient particularity that his protected speech was a substantial or motivating factor in Appellees' denying or belatedly disbursing various benefits to him. Because this is all that Falco must show at this motion to dismiss stage, his First Amendment speech retaliation claim survives, albeit severely narrowed: only his support for political opponents of Zimmer, filing the instant lawsuit, and testifying in *Alicea* are protected speech activities and only Appellees' withholding of various benefits is plausible retaliation. We need not consider the third element of a valid First Amendment retaliation claim—whether Appellees would have taken the same action even if Falco had not engaged in his protected

48

speech—as Falco does not bear its burden and Appellees present no arguments to that effect. *See Munroe*, 805 F.3d at 466 (citation omitted).

### C. Falco Fails to State Any Plausible Procedural Due Process Claims

Falco also seeks to revive the procedural due process claims the District Court dismissed with prejudice in its order dismissing his second amended complaint. But, upon reviewing these claims *de novo*, we determine that the District Court properly dismissed them.

In order to state a claim for violation of procedural due process rights, Falco must allege "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill*, 455 F.3d at 233–34 (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)). Because Falco here asserts protected property interests in various benefits, he must show a legitimate claim of entitlement in them that is protected by the Fourteenth Amendment, *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) and *Perry v. Sindermann*, 408 U.S. 593, 602 (1972)), not merely an "abstract need or desire" or "unilateral expectation" for them, *Roth*, 408 U.S. at 577. Such claims of entitlement are, of course, not created by the Constitution of the United States. *Id.* Instead, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

49

We have identified two types of rights relevant here that are afforded due process protections: (1) contract rights that arise by way of extreme dependence, such as welfare benefits, or permanence in employment because of tenure; and (2) contract rights that arise from a contract provision stating that a public entity can only terminate the contract for cause. *Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1399 (3d Cir. 1991) (citations omitted).

In his second amended complaint—the operative complaint as to the instant claims—Falco asserted five counts for procedural due process violations: one each for Appellees' withholding, allegedly without due process of law, various benefits, such as (1) a uniform allowance; (2) an attendance incentive; (3) a pay raise; (4) overtime pay, including a Superstorm Sandy-related stipend; and (5) a court time and preparation benefit. The District Court, however, determined that Falco does not have a constitutionally protected property interest in any of these compensation items. We agree.

First, Falco argues that he has a constitutionally protected property interest in the various benefits given two state laws: N.J. Stat. Ann. §§ 40A:14-147 and 40A:14-179. Yet, for substantially the same reasons that the District Court provided, we likewise determine that these state laws do not establish a legitimate claim of entitlement in the benefits Falco seeks. In short, the laws do not stand for the broad propositions that Falco presses. In particular, N.J. Stat. Ann § 40A:14-147 only protects certain HPD officers from removal of office, suspension, or fines without cause; it does not, however, grant them a right in the various benefits at issue here.

50

Similarly, N.J. Stat. Ann. § 40A:14-179 is to no avail here.  That statute requires that, "whenever new base salary ranges are set" for the officers of a police department in New Jersey, "unless the [C]hief of [P]olice . . . consent[s] to a lesser adjustment, the base salary for the [C]hief of [P]olice . . . shall be adjusted to ensure that [his] base salar[y] remain[s] higher than the base salaries of other ranking supervisory officers in the department." *Id.*  Unfortunately, the statute "is not a model of clarity," opening it to multiple possible readings.  *Smith v. Twp. of Andover*, 662 A.2d 582, 586 (N.J. Super. Ct. App. Div. 1995).  But appellate courts in New Jersey have consistently interpreted that, "[a]t a minimum, the statute requires that the [C]hief be paid a higher base salary than the next highest ranking officer."  *In re Snellbaker*, 997 A.2d 288, 290 (N.J. Super. Ct. App. Div. 2010) (citing *Smith*, 662 A.2d at 586–87).

The question is whether the statute requires anything more.  The Supreme Court of New Jersey has not answered this question, so we must "predict how it would rule if faced with the issue."  *White v. Sunoco, Inc.*, 870 F.3d 257, 264 (3d Cir. 2017) (citation omitted).  Other New Jersey appellate courts have not looked at this precise question, so we cannot look to them for aid.  But we find the statutory history here to be enlightening.  The original version of this law guaranteed that, if the other officers got a raise, the Chief of Police would also get a raise of "at least the same percentage."  1991 N.J. Laws 854.  The current version does not contain this specific guarantee.  *See* N.J. Stat. Ann. § 40A:14-179.  We believe this change is significant.

We accordingly make a prediction under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), that the statute ensures only that the Chief of Police is paid more than subordinate

51

officers. It does not ensure that the Chief of Police will get a raise whenever his subordinates do. Falco's allegation that he did not receive a pay raise for a few months while other officers did does not mean that their salaries surpassed his. In the absence of this specific allegation, N.J. Stat. Ann. § 40A:14-179 does not create for Falco a protected property interest in the pay raise about which he bemoans.

Second, Falco avers that his contractual relationship with Hoboken over several decades as a police officer, during which he was a member of the PBA and PSOA's collective bargaining agreements with the HPD, created a legitimate claim of continued entitlement to the benefits in question even as Chief. But, in the operative complaint, Falco himself concedes that the Chief of Police "is not a member of that bargaining unit." App. 83. Those collective bargaining agreements therefore cannot provide the basis for a legitimate expectation in receiving the benefits now at issue. Without a contract providing such a protected property interest, Falco does not have a valid procedural due process claim.

Third, Falco posits that Hoboken's practice of providing the Chief of Police with the same benefits other police officers receive in their collective bargaining agreements and his receiving those compensation items in his early years as Chief created a protected property interest in them. However, in the absence of a contract requiring that, Falco's allegations are more appropriately classified as a "unilateral expectation" rather than a legitimate claim of entitlement. *Roth*, 408 U.S. at 577.

Fourth, Falco points to a Hoboken ordinance allegedly providing that department heads are to receive benefits equivalent to those set forth in the collective bargaining

agreement between Hoboken and its municipal supervisors' union. But the second amended complaint—the operative complaint as to Falco's procedural due process claims—is devoid of any references to such an ordinance. This argument is thus unavailing because (1) we are limited to reviewing only Falco's operative complaint at this motion to dismiss stage; (2) there are no allegations regarding this argument in that complaint; and (3) as discussed previously, we decline to expand the record on appeal.

For these same reasons, Falco's sixth and seventh contentions—that Falco had union dues deducted from his paycheck even as Chief of Police and that Liston believes that Falco should have received the same benefits as PSOA members—are also in vain. Unable to muster a protected property interest in the benefits withheld from him, Falco thus has no plausible procedural due process claim, as the District Court correctly decided.

## IV. CONCLUSION

For the foregoing reasons, we will reverse in part and affirm in part the District Court's orders and remand this case for further proceedings consistent with this opinion.[3]

---

[3] Although Appellees hastily raise the issue of qualified immunity on appeal, District Court did not discuss the issue in dismissing Falco's second amended complaint and expressly declined to reach the issue in dismissing Falco's fourth amended complaint. Accordingly, we decline to consider the issue. *See Forestal Guarani S.A. v. Daros Int'l, Inc.*, 613 F.3d 395, 401 (3d Cir. 2010) ("We ordinarily decline to consider issues not decided by a district court, choosing instead to allow that court to consider them in the first instance." (citing *In re Montgomery Ward & Co.*, 428 F.3d 154, 166 (3d Cir. 2005) and *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 778 (3d Cir. 2001))).

In addition, Falco's § 1985(3) claim is waived because his briefing fails to address any conspiracy or discriminatory animus by Appellees. *See Lake v. Arnold*, 112 F.3d 682,

685 (3d Cir. 1997) (enumerating elements of a § 1985(3) claim); *see also N.J. Media Grp. Inc., v. United States*, 836 F.3d 421, 426 n.20 (3d Cir. 2016) (deeming an argument waived based on its "utterly undeveloped character" (citation omitted)).